195 P.3d 1177

Peter B. CARLISLE, in his official capacity as the Prosecuting Attorney of the City and County of Honolulu, on behalf of the State of Hawai'i, Respondent/Petitioner–Appellant,

v.

ONE (1) BOAT, 18.5 Feet With Fiberglass Hull, Blue and White In Color, Registration No. Ha 2709 D, Hull Identification No. GLA72495M77G, With Trailer, Serial No. TUD051894HDNWP, and Gas Engine With Winch System (Estimated Value: $4,000.00); One (1) Evinrude Brand Outboard Engine, 112 Horsepower, Serial No. G04072044, and One (1) Evinrude Brand Outboard Engine, 30 Horsepower, Serial No. G03586474 (Estimated Value: $1,000.00); Two (2) Monofilament Gill Nets, Each Approximately 1500 Feet in Length (Estimated Value: $3,000.00) (Aggregate Estimated Value $8,000.00), Defendant,

and

Dang Van Tran and Sang Tran, Petitioners/Interested Persons–Appellees.

No. 26995.

Supreme Court of Hawai'i.

Nov. 17, 2008.

Bryan Y.Y. Ho, Honolulu, for petitioners/interested persons appellees.

Charlotte J. Duarte, Deputy Prosecuting Attorney, for respondent/petitioner-appellant.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

On June 26, 2008, this court accepted a timely application for a writ of certiorari, filed by petitioners/interested persons-appellees Dang Van Tran (Dang) and Sang Tran (Sang) [hereinafter, collectively, the Trans] on May 27, 2008, requesting this court review the Intermediate Court of Appeals' (ICA) March 17, 2008 judgment on appeal, entered pursuant to its published opinion in *Carlisle v. One Boat*, 118 Hawai'i 107, 185 P.3d 855 (Haw.Ct.App.2008). Therein, the ICA vacated the Circuit Court of the First Circuit's:

(1) February 1, 2002 order[1] granting the Trans' motion to dismiss the verified petition for forfeiture of property filed by respondent/petitioner-appellant Peter Carlisle, in his official capacity as the Prosecuting Attorney of the City and County of Honolulu, on behalf of the State of Hawai'i (the State); (2) December 6, 2004 judgment entered in favor of the Trans; and (3) January 20, 2005 order granting in part and denying in part the Trans' motion to strike the judgment or, in the alternative, to amend the judgment to correct errors and enter the judgment *nunc pro tunc.*[2] *One Boat,* 118 Hawai'i at 119, 185 P.3d at 867. Oral argument was held on September 4, 2008.

Briefly stated, the events giving rise to the State's verified petition, seeking judicial forfeiture, centers around the surveillance of fishing boats in waters off the Wai'anae coast by Department of Land and Natural Resources (DLNR) officers. While on patrol, the officers observed individuals on a boat, later determined to be owned by the Trans, pulling up a gill net. After boarding the Trans' boat and conducting an investigation, the DLNR officers seized the boat and other items based on an alleged illegal taking of stony coral, in violation of Hawai'i Administrative Regulations (HAR) § 13–95–70 (1998), quoted *infra,* and the illegal taking of live rocks, in violation of HAR § 13–95–71 (1998), quoted *infra,* that were found in the gill net. Ultimately, the circuit court—on motion by the Trans—dismissed the State's verified petition, finding that (1) the State's petition failed to state a claim upon which relief could be granted and (2) the circuit court lacked subject matter jurisdiction over the forfeiture claims. The circuit court's order of dismissal was filed on February 1, 2002; however, no judgment was entered in the case until December 6, 2004—two years and ten months later. The State appealed, and the ICA, as previously stated, vacated the circuit court's dismissal.

On application, the Trans' contention of error is based upon: (1) the ICA's lack of appellate jurisdiction inasmuch as "[the

State] failed to timely perfect [its] right to appeal [the circuit court]'s ruling," and (2) their assertion that the circuit court correctly determined there was no specific statutory authorization for the forfeiture claims of the state.

Based on the following discussion, we hold that, although the ICA had jurisdiction to entertain the State's appeal, it erred in vacating the circuit court's orders and judgment inasmuch as the relevant statutes and administrative regulations do not provide the required specific statutory authorization for the State's forfeiture claims. Therefore, we reverse the ICA's March 17, 2008 judgment on appeal and affirm the circuit court's February 1, 2002 order, December 6, 2004 judgment, and January 20, 2005 order.

## I. BACKGROUND

### A. Proceedings Before the Circuit Court

#### 1. The State's Verified Petition for Forfeiture

On March 29, 2001, the State filed a verified petition, seeking forfeiture of property in which the Trans had an interest, to wit: (1) one 18.5 foot fiberglass hull boat with trailer, and gas engine with winch system (estimated value of $4,000.00); (2) one Evinrude brand 112 horsepower outboard engine and one Evinrude brand 30 horsepower outboard engine (estimated value of $1,000.00); and (3) two monofilament gill nets (estimated value of $3,000) [hereinafter, collectively, the property]. As indicated by the ICA, the State alleged the following facts in its petition:

> [O]n the night of October 14, 2000, at around 9:00 p.m., [DLNR], Division of Conservation and Resource Enforcement (DOCARE) officers, while on patrol in a DOCARE boat, observed two males in a brightly lit vessel fishing with a large gill net off the Wai'anae coast of the island of O'ahu. During their surveillance, the officers witnessed Kalani Baldarama (Baldarama) pulling up a gill net and Dang operating the vessel. The officers then

---

1. The Honorable Reynaldo D. Graulty presided over the underlying proceedings unless otherwise indicated.

2. The Honorable Marcia J. Waldorf presided over the Trans' motion to strike.

proceeded to the vessel. When the officers arrived, they saw Dang and Baldarama pulling up a net without a diver in the water to assist in retrieval of the net.

According to the DOCARE officers, once they arrived at [the Trans]' boat, they identified themselves and stated their intention to conduct an inspection of the boat. Two of the DOCARE officers boarded [the Trans]' boat while the third officer remained alongside in the DOCARE boat. The officers told Dang and Baldarama to continue to retrieve the net and requested that they not remove any coral from the net or the boat, as the officers needed to determine whether the coral was alive.

The DOCARE officers stated that Dang became angry at this request and told the officers that if the net was tangled he would send his diver down. The officers responded that a diver should have been in the water to prevent damage to the coral and it was evident that coral had already been damaged and removed from the water. While the net was in the process of being pulled in, Baldarama put on his scuba gear and descended to untangle the net and release regulated fish.

The officers stated that[,] even with Baldarama in the water to untangle the net from the bottom, the DOCARE officers on [the Trans]' boat witnessed several "large" pieces of live coral stuck in the net. According to the officers, Dang attempted to throw back into the water some of the coral stuck in the net and became "enraged" when officers prevented him from doing so. During this encounter, the officers had to physically restrain Dang in order to prevent him from removing the coral stuck in the net. [3]

Shortly thereafter, Dang calmed down, but began to complain of chest pains and shortness of breath. The officers then escorted [the Trans]' boat to shore and arranged for an ambulance to pick up Dang to take him for treatment. Shortly thereafter, Dang's son, Sang, arrived at the harbor and notified the officers that he was the registered owner of the boat. The officers informed Sang that the boat, the nets, a trailer, the coral found in the nets, and other items left on the boat were being seized as evidence.

The petition further alleged that under the forfeiture provisions codified in [Hawai'i Revised Statutes (HRS)] Chapter 712A, [the Trans]' property was subject to seizure and forfeiture because the offenses Dang allegedly committed, "Intentional Taking of Live Coral," in violation of [HAR] § 13–95–70, [4] and "Intentional Taking of Live Rock," in violation of HAR § 13–95–71, [5] were "covered offenses" pursuant to HRS § 712A–4(a) [(Supp. 2000), quoted *infra*]. The petition alleged that pursuant to HRS § 712A–5 [(1993 and Supp.2000), quoted *infra*], probable cause existed for the seizure and forfeiture of [the Trans]' property as "it was used or intended for use, including without limitation, in the commission of, attempt to commit, or conspiracy to commit a covered offense, or which facilitated or assisted in such activity[.]"

*One Boat,* 118 Hawai'i at 109–110, 185 P.3d at 857–58 (footnotes and original ellipsis omitted). On June 4, 2001, the Trans timely filed an answer to the State's petition, essentially denying the allegations in the petition and asserting, among other defenses, a lack

3. Based upon the State's allegations, it appears the DOCARE officers reported that three pieces of coral were caught in the net; one piece was thrown back into the water by Dang, and two "large" pieces were retrieved by the DOCARE officers and seized as evidence.

4. HAR § 13–95–70 (1998) stated in relevant part:

 *Stony Corals.* (a) The intentional taking, breaking, or damaging with crowbar, chisel, or any other implement of any live stony coral of the taxonomic order, Madreporaria, including the Fungidae or Pocilloporidae families, is pro-

hibited except with a permit authorized under sections 183–41 or 187A–6, HRS, or by section 13–74–43, or as maybe otherwise authorized by law.

5. HAR § 13–95–71 (1998) stated in relevant part:

 *Live Rocks.* (a) The intentional taking, breaking, or damaging with crowbar, chisel, or any other implement of any rock or coral to which marine life is visibly attached or affixed is prohibited except with a permit authorized under sections 183–41 or 187A–6, HRS, or by section 13–74–43, or as maybe otherwise authorized by law.

of subject matter jurisdiction and the failure of the petition to state a claim upon which relief could be granted. Additionally, on the same day, the Trans filed a notice of claim, contending that the property had been wrongfully seized and was not subject to forfeiture.

## 2. The Trans' Motion to Dismiss

Thereafter, on November 30, 2001, the Trans filed a motion to dismiss the verified petition, arguing that the petition was subject to dismissal due to (1) a lack of subject matter jurisdiction and (2) failure of the petition to state a claim upon which relief could be granted.

### a. *the relevant law*

Preliminarily, we first set forth the relevant statutes relating to (1) HAR §§ 13–95–70 and 13–95–71 and (2) forfeiture pursuant to Chapter 712A. Both regulations, *see supra* notes 4 and 5, were authorized and implemented pursuant to HRS § 187A–5 (1993), which provides that, "[s]ubject to [C]hapter 91, [DLNR] shall adopt, amend, and repeal rules for and concerning the protection and propagation of introduced and transplanted aquatic life, or the conservation and allocation of the natural supply of aquatic life in any area." HRS § 187A–5 further provides that "[a]ll rules shall have the force and effect of law. *Any person who violates any of the rules adopted pursuant to this section* shall be guilty of a petty misdemeanor and upon conviction thereof *shall be punished as provided by section 188–70.*" (Emphases added.) In turn, HRS § 188–70 (Supp.2007) provides in relevant part:

(a) Any person violating any provision of this chapter … or any rule adopted pursuant thereto, is guilty of a petty misdemeanor and, in addition to any other penalties, shall be fined not less than:

(1) $100 for a first offense;

(2) $200 for a second offense; and

(3) $500 for a third or subsequent offense.

Under HRS § 712A–5(1), items subject to forfeiture include "(b) *[p]roperty used* or in-

tended for use in the commission of, attempt to commit, or conspiracy *to commit a covered offense,* or which facilitated or assisted such activity." (Emphases added.) The phrase "covered offense" is defined in HRS § 712A–4 as follows:

**Covered offenses.** Offenses for which property is subject to forfeiture under this chapter are:

(a) All offenses which specifically authorize forfeiture;

(b) Murder, kidnapping, gambling, criminal property damage, robbery, bribery, extortion, theft, unauthorized entry into motor vehicle, burglary, money laundering, trademark counterfeiting, insurance fraud, promoting a dangerous, harmful, or detrimental drug, or commercial promotion of marijuana, which is chargeable as a felony offense under state law;

(c) The manufacture, sale, or distribution of a controlled substance in violation of chapter 329, promoting detrimental drugs or intoxicating compounds, promoting pornography, promoting pornography for minors, or promoting prostitution, which is chargeable as a felony or misdemeanor offense, but not as a petty misdemeanor, under state law; and

(d) The attempt, conspiracy, solicitation, coercion, or intimidation of another to commit any offense for which property is subject to forfeiture.

(Bold emphasis in original.) (Underscored emphases added.)

### b. *the Trans' motion and the circuit court's ruling*

In substance, the Trans argued in their motion to dismiss that the property was not subject to forfeiture because the offenses charged against Dang were not " 'covered offenses [that] specifically authorize[d] forfeiture' as required by [HRS] § 712A–4." The State opposed the Trans' motion, contending that "the only reasonable interpretation of [HRS c]hapter 712A [ (dealing with forfeiture) ] and Title 12 [6] … will lead [the circuit court] to conclude that violations of

---

**6.** Title 12 deals with conservation and resources and contains HRS § 187A–5, which, as previously quoted, authorized promulgation of HAR §§ 13–95–70 and 13–95–71.

[HAR §§ ]13–95–70 and [13–95]–71 ... constitute covered offenses under HRS [c]hapter 712A." (Bold emphasis omitted.) In support of its position, the State pointed to HRS § 199–7 (Supp.2000), which is included in the "enforcement" section of Title 12 and stated in relevant part:

**Search and seizure; forfeiture of property.** (a) Any police officer or agent of [DLNR] upon whom the board of land and natural resources has conferred powers of police officers, shall have the authority to conduct searches on probable cause as provided by law and to seize any equipment, article, instrument, aircraft, vehicle, vessel, business records, or natural resource used or taken in violation of the provisions contained in ... title 12, or any rules adopted thereunder....

(b) *Any equipment,* article, instrument, aircraft, vehicle, *vessel,* business records, or *natural resource seized is subject to forfeiture pursuant to chapter 712A. Unless otherwise directed by the court pursuant to chapter 712A,* any item, other than a natural resource, seized shall be ordered forfeited to the State for disposition as determined by the department, or may be destroyed, or may be kept and retained and utilized by the department or any other state agency. If not needed or required by the department or other state agency, the forfeited items shall be disposed of as provided by chapter 712A.

(Emphases added.) Based on HRS § 199–7, the State asserted that the Trans' arguments that alleged violations of HAR §§ 13–95–70 and 13–95–71 were not "covered offenses" within the meaning of HRS 712A–4 would "render the statutory schemes of both Chapter 712A and Title 12 superfluous and result in absurdity." Additionally, the State argued that the legislative history behind the enactment of, and amendments to, HRS § 199–7 indicated that "it was [the] legislature's clear intent to authorize DLNR's use of asset forfeiture as an additional remedy for Title 12 violations."

In response to the State's arguments, the Trans asserted that HRS § 199–7 was not "on its face" a "statute setting forth an 'offense,' nor even an offense contemplated by

HRS § 712A–4(a)" but, instead, "only 'empowers' officers of [DOCARE] to conduct searches on probable cause and to 'seize' property taken in violation of [T]itle 12, or any rules adopted thereunder." As such, the Trans argued that HRS § 199–7

[was] insufficient to meet [HRS § ]712A–4(a)'s specific requirement that a covered offense, for purposes of forfeiture, must "specifically authorize forfeiture," before any property "seized" pursuant to [HRS] § 199–7(a) can be forfeited. In other words, *if HAR §§ 13–95–70 and 13–95–71 are the alleged offenses in this case, then* those administrative rules and/or their penalty provisions must "specifically authorize forfeiture" in order for [the State] to institute a forfeiture proceeding.

On December 19, 2001, a hearing was held on the Trans' motion to dismiss, wherein the parties presented their above positions, focusing—at the request of the circuit court—on the parties' differing interpretations of HRS § 199–7. Thereafter, the circuit court orally granted the Trans' motion to dismiss. On February 1, 2002, the circuit court filed an order consistent with its oral ruling, which also contained the following conclusions of law (COL):

1. An *[i]n [r]em* forfeiture proceeding under [HRS c]hapter 712A ... is a civil proceeding governed by the Hawai'i Rules of Civil Procedure [ (HRCP) ]; therefore, the defenses of lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, pursuant to [HRCP] [R]ules 12(b)(1) and 12(b)(6), ... are appropriate defenses to assert in a Chapter 712A *[i]n [r]em* civil forfeiture proceeding;

2. Generally, forfeitures are not favored by the law and should be enforced only when within both the letter and spirit of the law. *See Klinger v. Kepano,* 64 Haw. 4, 9, 635 P.2d 938, 942 (1981);

3. [The State] alleged in [its p]etition that seizure for forfeiture and forfeiture in this case were proper because the [Trans'] property relates to alleged covered offenses under [HRS] § 712A–4;

4. HRS § 712A–4(a)–(d) list the specific offenses for which property is subject to forfeiture under HRS [c]hapter 712A;

5. HRS § 712A–4(a) permits forfeiture for all offenses "which specifically authorize forfeiture," therefore, offenses on which a forfeiture action is based under HRS § 712A–4(a) of the [HRS] must be offenses which "specifically authorize forfeiture." HRS § 712A–4(b)–(d) are not applicable to the present action;

6. The [p]etition asserts an intentional taking under HAR §§ 13–95–70 and 13–95–71 as the two covered offenses upon which this forfeiture action is based;

7. HAR §§ 13–95–70 and 13–95–71 do not specifically authorize forfeiture for a violation of these administrative rules;

8. HAR § 13–95–2, the penalty provision for violations of HAR [t]itle 13, [s]ubtitle 4, [p]art V, [c]hapter 95, does not specifically authorize forfeiture for a violation of HAR §§ 13–95–70 and 13–95–71;

9. HRS §§ 187A–5, 187A–12.5, 187A–13, 188–53, 188–70 and 189–4 [ all of which relate to aquatic resources and fishing rights) ] do not specifically authorize forfeiture for a violation of the provisions of, or rules adopted under HRS [c]hapters 187A, 188 or 189;

10. [The State] argued that, based upon statutory interpretation and construction of HRS [c]hapter 712A, HRS [t]itle 12 and HRS § 199–7, that [sic] HAR §§ 13–95–70 and 13–95–71 are covered offenses which specifically authorize the forfeiture proceedings in the [p]etition;

11. *The [circuit c]ourt disagrees with [the State], and finds that a covered offense under HRS § 712A–4(a) is an offense which specifically authorizes forfeiture; and in this case, neither HAR §§ 13–95–70 or 13–95–71, or any of the penalty provisions for a violation of these two administrative rules, specifically authorize forfeiture as required by HRS § 712A–4(a); and unless an offense or penalty provision for the offense specifically authorizes forfeiture, the offense is not a covered offense under HRS § 712A–4(a);*

*and therefore HAR §§ 13–95–70 and 13–95–71 are not covered offenses because the alleged offenses, or their penalty provisions, do not specifically authorize forfeiture as required by HRS § 712A–4(a);*

12. Since HAR §§ 13–95–70 and 13–95–71 are not covered offenses for purposes of forfeiture proceedings under HRS § 712A, the [p]etition fails to state a claim upon which relief can be granted, and the [circuit c]ourt lacks subject matter jurisdiction over the forfeiture claims in the [p]etition.

(Emphasis added.) (Footnote omitted.)

### 3. The December 6, 2004 Judgment

After the issuance of the circuit court's February 1, 2002 order dismissing the State's verified petition, no further action was taken in the instant case until December 6, 2004, at which time, a judgment—prepared by the State—was filed in favor of the Trans and against the State. Thereafter, on December 9, 2004, the State filed a notice of appeal. On December 13, 2004, the Trans filed—pursuant to HRCP Rule 60 (2007)—a motion to strike the judgment or, in the alternative, to amend the judgment to correct errors and enter the judgment *nunc pro tunc,* effective February 1, 2002 [hereinafter, the motion to strike the judgment]. Specifically, the Trans requested that two typographical errors be corrected and, essentially, argued that the State should be precluded from appealing from the judgment inasmuch as the circuit court's February 1, 2002 order of dismissal was "a final order which [the State], under Hawai'i Rules of Appellate Procedure [ (HRAP) ] Rule 4(a)(1) [ (2001) ], [7] ... was required to challenge within 30 days after it was filed."

The State opposed the Trans' motion to strike the judgment, arguing, *inter alia,* that the circuit court's February 1, 2002 order was not an appealable order because it "was incomplete as it did not address [the Trans'] claims against [the State] for attorneys fees and costs."

---

7. HRAP Rule 4(a)(1) stated in relevant part: "[W]hen a civil appeal is permitted by law, the notice of appeal shall be filed within 30 days after entry of the judgment or appealable order."

A hearing was held on December 27, 2004,[8] wherein the parties argued their above stated positions. On January 20, 2005, the circuit court issued an order granting in part and denying in part the Trans' motion to strike the judgment. Specifically, the circuit court granted the Trans' request to (1) correct one clerical or typographical error in the judgment and (2) enter the judgment *nunc pro tunc* to February 1, 2002. However, the circuit court, citing the ICA's decision in *Stratis v. Pacific Insurance Co.*, 8 Haw.App. 79, 82–83, 794 P.2d 1122, 1124–25 (1990), held that the *nunc pro tunc* provision could not be used to defeat the State's right to appeal from the judgment and the State's time to appeal ran from the actual date of entry of the circuit court's order. The circuit court denied all other relief requested by the Trans. The State filed a second notice of appeal on January 24, 2005, appealing from the circuit court's (1) January 20, 2005 order and (2) December 6, 2004 judgment.

## B. *Appeal Before the ICA*

On direct appeal, the State argued that the ICA had appellate jurisdiction because the State had timely filed its notice of appeal from the circuit court's December 6, 2004 judgment. Additionally, the State contended that the circuit court erred in granting the Trans' motion to dismiss the petition because

[t]he language of [HRS subs]ections 199–7(a) and (b) clearly provided for forfeiture under Chapter 712A for violations of Title 12, which includes [HRS § ]199–7, and the administrative rules promulgated pursuant to Title 12. It is unquestionable that the offenses listed by [the State] as "covered offenses" are violations of sections of the HAR, which were promulgated pursuant to Title 12. Although the words "covered offense" are not specifically included in [HRS § ]199–7 it is evident that the forfeiture procedures of Chapter 712A have been incorporated into Title 12 by repeated reference in HRS [§ ]199–7.

(Bold emphasis omitted.) The Trans, conversely, argued that the State waived its right to pursue the instant appeal because the circuit court's February 1, 2002 order

granting the Trans' motion to dismiss was an appealable order and that the State should have filed its notice of appeal within thirty days of the entry of the order, pursuant to HRAP 4(a)(1). Inasmuch as the State did not appeal the order within thirty days, the Trans believed that "[the State's] right to prosecute [the instant] appeal [was] time barred." Consequently, the Trans maintained that the ICA lacked appellate jurisdiction. Additionally, the Trans argued that the circuit court correctly dismissed the verified petition because HAR §§ 13–95–70 and 13–95–71 did not:

(1) specifically authorize forfeiture of [the] property; and (2) otherwise fall in the category of other offenses for which forfeiture of property is permitted under [HRS] § 712A–4. The statute [the State] relies on, HRS § 199–7, merely delineates the nature and scope of the police powers bestowed on enforcement officers of the DLNR, DOCARE. It does not authorize or mandate the blanket seizure and/or forfeiture of property for alleged violations of [the] HAR generally and/or HAR §§ 13–95–70 and 13–95–71 specifically.

In its February 27, 2008 published opinion, the ICA accepted the State's arguments and vacated the circuit court's (1) February 1, 2002 order granting the Trans' motion to dismiss; (2) December 6, 2004 judgment entered in favor of the Trans; and (3) January 20, 2005 order relating to the Trans' motion to strike. *One Boat*, 118 Hawai'i at 119, 185 P.3d at 867. As discussed more fully *infra*, the ICA held that (1) there was appellate jurisdiction inasmuch as the State timely appealed from the December 6, 2004 judgment and (2) the circuit court erred in dismissing the State's verified petition for forfeiture because "HRS § 199–7 authorizes the DLNR to initiate forfeiture proceedings for violations of DLNR rules, including the rules allegedly violated [by the Trans], and accordingly those rules were 'covered offense[s]' for purposes of HRS [c]hapter 712A." *Id.* at 114, 185 P.3d at 862.

The Trans timely filed their application for a writ of certiorari on May 27, 2008. The

---

8. The Honorable Marcia J. Waldorf presided over the hearing and all remaining proceedings.

State filed a response on May 30, 2008. This court accepted the Trans' application on June 26, 2008 and heard oral argument on September 4, 2008.

## II. *STANDARDS OF REVIEW*

### A. *Statutory Interpretation*

 "The interpretation of a statute . . . is a question of law reviewable *de novo.*" *Flor v. Holguin,* 94 Hawai'i 70, 76–77, 9 P.3d 382, 388–89 (2000) (original brackets, internal citations, and some ellipses omitted). Further, "[t]his court has accorded persuasive weight to the construction of statutes by administrative agencies charged with overseeing and implementing a particular statutory scheme." *Sam Teague, Ltd. v. Hawai'i Civ. Rights Comm'n,* 89 Hawai'i 269, 276 n. 2, 971 P.2d 1104, 1111 n. 2 (1999). Nonetheless, "an interpretation by an agency of a statute it administers is not entitled to deference if the interpretation is plainly erroneous and inconsistent with both the letter and intent of the statutory mandate." *Haole v. State,* 111 Hawai'i 144, 150, 140 P.3d 377, 383 (2006) (citation omitted).

*Capua v. Weyerhaeuser,* 117 Hawai'i 439, 444, 184 P.3d 191, 196 (2008).

### B. *Motion to Dismiss*

 "A [circuit] court's ruling on a motion to dismiss is reviewed *de novo.*" *Kamaka v. Goodsill Anderson Quinn & Stifel,* 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008) (citation omitted).

## III. *DISCUSSION*

As previously stated, the Trans contend that the ICA erred in (1) concluding that it had appellate jurisdiction and (2) vacating the circuit court's (a) February 1, 2002 order granting the Trans' motion to dismiss, (b) December 6, 2004 judgment, and (c) January 20, 2005 order regarding the Trans' motion to strike the judgment. The Trans argue, first, that the ICA lacked jurisdiction to decide the State's appeal inasmuch as the State did not timely appeal from the circuit court's February 1, 2002 order, which the Trans believe was a final appealable order. Secondly, the Trans argue—as they did before the ICA—that the circuit court correctly dismissed the State's verified petition for forfeiture because HAR §§ 13–95–70 and 13–95–71: (1) did not "specifically authorize forfeiture of their property"; and (2) did not "otherwise fall in the category of other offenses for which forfeiture of property is permitted under [HRS] § 712A–4." Each of the Trans' contentions are addressed in turn.

### A. *Appellate Jurisdiction*

Before reaching the merits of the State's appeal, the ICA determined that it had appellate jurisdiction to decide the case. *One Boat,* 118 Hawai'i at 113, 185 P.3d at 861. Specifically, the ICA held, *inter alia,* that:

> [T]he February 1, 2002 [o]rder was not a final judgment from which the State could appeal. Because the State petitioned for *in rem* forfeiture pursuant to HRS § 712A–12, the HRCP apply. *State v. Tuipuapua,* 83 Hawai'i 141, 153, 925 P.2d 311, 323 (1996). "HRCP Rule 58 applies to civil actions 'in the circuit courts of the State,'" and that rule "requires that 'every judgment shall be set forth on a separate document.'" *Alford v. City [ & ] County of Honolulu,* 109 Hawai'i 14, 20, 122 P.3d 809, 815 (2005) (quoting HRCP Rule 58). The Hawai'i Supreme Court has established "bright line rules," holding that "[a]n appeal may be taken from circuit court orders resolving claims against parties only after the orders have been reduced to a judgment and the judgment has been entered in favor of and against the appropriate parties pursuant to HRCP Rule 58." *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 119, 869 P.2d 1334, 1338 (1994) [ (per curiam) ]. Accordingly, an order disposing of a circuit court case is appealable when the order is reduced to a separate judgment. *Id.* at 119, 869 P.2d at 1338. Thus, even if the circuit court's February 1, 2002 [o]rder resolved all the claims regarding all parties, under HRCP Rule 58 and the Hawai'i Supreme Court's holding in *Jenkins,* the circuit court's February 1, 2002 [o]rder needed to be reduced to a separate judg-

ment before the period for the State's appeal began to run.

*One Boat,* at 113, 185 P.3d at 861 (original brackets omitted).

As previously stated, the Trans argue, on application, that the ICA lacked jurisdiction to decide the case. Specifically, they contend that, pursuant to HRAP Rule 4, "the deadline for [the State] to file a notice of appeal to challenge [the circuit court]'s [February 1, 2002 o]rder dismissing the [v]erified [p]etition was March 30, 2002" because

> [t]here is no basis in fact or law to dispute [the circuit court's o]rder dismissing [the State]'s [v]erified [p]etition was a final appealable order that directed all claims for relief sought by [the State] were denied and dismissed in their entirety. [The State] took no action to preserve or prosecute [its] right to appeal [the circuit court]'s ruling for 2 years and 9 months.

Additionally, the Trans contend that:

> The ICA's application of *Jenkins v. Cades, Schutte, Fleming & Wright,* 76 Hawai'i 115, 869 P.2d 1334 (1994), to the facts of this case was erroneous and bordered on absurd. As noted above, [HRAP] Rule 4 ... mandates that a notice of appeal must be filed within 30 days of the filing of a judgment *or* appealable order. The ICA held that[,] under *Jenkins* and [HRCP] Rule 58, ... [the circuit court]'s order dismissing [the Trans' v]erified [p]etition was not subject to appeal until a separate judgment was filed. There is no compelling reason for this [c]ourt to adopt a rigid application of *Jenkins* to the facts and circumstances of this case. The "bright line rule" developed in *Jenkins* was intended to eliminate confusion regarding the deadline for filing a notice of appeal in cases where there has been only a partial resolution of cases involving multiple parties and/or multiple claims. It was also intended to relieve Hawai'i's appellate courts from the burden of having to review the proceedings of the lower court to verify all claims against all parties had actual been disposed of. These concerns are not at issue in this case.

(Emphasis in original.) We disagree.

 As previously quoted, HRAP Rule 4(a)(1) provided in relevant part that, "when

a civil appeal is permitted by law, *the notice of appeal shall be filed within 30 days after entry of the judgment or appealable order.*" (Emphasis added.) HRCP Rule 58 (2007) provides in relevant part that:

> The filing of the judgment in the office of the clerk constitutes the entry of the judgment; and the judgment is not effective before such entry. The entry of the judgment shall not be delayed for the taxing of costs. *Every judgment shall be set forth on a separate document.*

(Emphasis added.) In *Jenkins,* this court held that the sole purpose of the separate document provision contained in HRCP Rule 58 "is to determine when the time for appeal commences." 76 Hawai'i at 118, 869 P.2d at 1337. More importantly, the *Jenkins* court held, *inter alia,* that "*[a]n appeal may be taken from circuit court orders resolving claims against parties only after the orders have been reduced to a judgment* and the judgment has been entered in favor of and against the appropriate parties pursuant to HRCP [Rule] 58." *Id.* at 119, 869 P.2d at 1338 (emphasis added). Further, the *Jenkins* court held that such "bright line rules" would be strictly enforced. *Id.* Thus, based on *Jenkins* and HRCP Rule 58, an order is not appealable, even if it resolves all claims against the parties, until it has been reduced to a separate judgment. Although, certain exceptions to this rule have been recognized, specifically, with regard to post-judgment orders, *see, e.g., Ditto v. McCurdy,* 103 Hawai'i 153, 80 P.3d 974 (2003) (holding that trial court's order on a post-judgment motion was a final order for appeal purposes), and ongoing family court cases, *see, e.g., State, Child Support Enforcement Agency v. Doe,* 98 Hawai'i 58, 41 P.3d 720 (App.2001) (holding that the HRCP are inapplicable to proceedings in the family courts), neither of those exceptions apply in this case. Therefore, no appeal was possible from the circuit court's February 1, 2002 order resolving all the claims until such order was reduced to a judgment. Accordingly, we hold the ICA correctly determined that it had appellate jurisdiction.

B. *The State's Verified Petition for Forfeiture*

As previously stated, the State argued on direct appeal that the circuit court erred in granting the Trans' motion to dismiss because the plain language of HRS § 199–7 "clearly provided for forfeiture under Chapter 712A for violations of . . . the administrative rules promulgated pursuant to Title 12." The State, additionally, pointed to the legislative history of HRS § 199–7 as evincing the legislature's intent to authorize forfeiture for violations of administrative regulations promulgated by DLNR pursuant to Title 12.

The ICA agreed with the State and concluded that "the circuit court's analysis [was] contrary to both the plain language of the applicable statutes and rules, as well as the intent of the legislature as reflected by the legislative history." *One Boat*, 118 Hawai'i at 114, 185 P.3d at 862. With regard to the plain language of the applicable statutes, the ICA reasoned that, "[o]n its face, HRS § 199–7 unambiguously provides that property used in violation of Title 12 and the rules adopted thereunder is subject to seizure and forfeiture." *Id.* at 115, 185 P.3d at 863. The ICA also pointed out that HRS § 199–7(b) provides that forfeiture "shall be 'pursuant to [C]hapter 712A.'" *Id.* The ICA further reasoned that, "although 'covered offense' is implicitly defined in HRS § 712A–4(a)" as offenses "which specifically authorize forfeiture," the term "covered offense" is also defined in HRS § 712A–1 [ (Supp.2000),] entitled "Definitions." *Id.* at 115, 185 P.3d at 863. Specifically, the ICA stated:

> "Covered offense" is defined [in HRS § 712A–1] as "any crime set forth in section [HRS § ]712A–4 or any other offense for which forfeiture is provided by the *law relating to a particular offense*." HRS § 712A–1 (Supp.2000) (emphasis added). There is nothing in that provision which requires that the authorization for forfeiture appear in the language of the covered offense itself; to the contrary, the definition makes clear that a provision such as HRS § 199–7 which "relat[es] to" the covered offense, and provides for forfeiture for a violation of it, is sufficient. HRS § 712A–4(a)'s reference to "offenses which

> specifically authorize forfeiture" should be read in light of § 712A–1's reference to "the law relating to a particular offense." When so read, HRS § 712A–4(a) does not require that the authorization for forfeiture be included in the covered offense itself.

*Id.* at 115, 185 P.3d at 863 (some brackets in original) (citation omitted). Additionally, the ICA determined that the Trans' contention "that 'HRS § 199–7, merely delineates the nature and scope of the police powers bestowed on enforcement officers of the [DLNR],'" was without merit because, "under [the Trans]' interpretation, the provisions in HRS § 199–7 authorizing forfeitures would be superfluous." *Id.* at 116, 185 P.3d at 864 (citing *Camara v. Agsalud*, 67 Haw. 212, 215–16, 685 P.2d 794, 797 (1984) ("It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute.")). The ICA also concluded that

> the legislative history of HRS § 199–7 and Chapter 712A confirms that the legislature intended [HRS] § 199–7 to authorize DLNR to seize and forfeit property used in violating HRS Title 12, and any rules adopted thereunder, without requiring each individual statute or rule, or applicable penalty provision, to specifically refer to forfeiture.

*Id.* at 116, 185 P.3d at 864.

On application, the Trans argue that the ICA erred inasmuch as its "decision is based on an unconstitutionally broad and inaccurate interpretation of HRS § 199–7." Specifically, the Trans contend that,

> [a]lthough HRS § 199–7 provides [DOCARE o]fficers with police powers, including the ability to execute seizures and forfeitures, a *plain reading* of the statute clearly establishes the statute does nothing more than delineate the nature and scope of enforcement tools bestowed on [DOCARE] officers. It does not authorize or mandate the blanket seizure and/or forfei-

ture of property for all violations of the HAR. Moreover, HRS § 199-7(b) indicates that whether or not property is subject to forfeiture is *"pursuant to"* the requirements of HRS [c]hapter 712A.... HRS § 712A-4(a) *requires* a "covered offense"—an offense which specifically authorizes forfeiture. In this case, neither HAR §§ 13-95-70 [or] 13-95-71, or any of the penalty provisions for violations of those administrative rules, *specifically authorize forfeiture.*

(Emphases in original.)

 "It is a well-established rule of statutory construction that this court's foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Kaho'ohanohano v. Dep't of Human Servs.,* 117 Hawai'i 262, 288, 178 P.3d 538, 564 (2008) (citation omitted) (format altered). In construing statutory language, this court has adhered to the following framework:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*In re Contested Case Hearing on Water Use Permit Application,* 116 Hawai'i 481, 489-90, 174 P.3d 320, 328-29 (2007) (citation omitted) (format altered). Moreover, this court has stated that,

where the statute is clear and unambiguous,[we are] bound by its plain and unam-

biguous language[.] We cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts. We do not legislate or make laws. *Even when the court is convinced in its own mind that the legislature really meant and intended something not expressed by the phraseology of the act, it has no authority to depart from the plain meaning of the language used.*

*State v. Klie,* 116 Hawai'i 519, 525, 174 P.3d 358, 364 (2007) (emphasis added) (format altered) (citation and original brackets omitted).

Here, the State sought forfeiture of the Trans' property under Chapter 712A for alleged violations of HAR §§ 13-95-70 and 13-95-71. As previously quoted, HRS § 712A-5 provides that items subject to forfeiture include "(b) [p]roperty used or intended for use in the commission of, attempt to commit, or conspiracy to commit *a covered offense,* or which facilitated or assisted such activity." (Emphasis added.) The phrase "covered offense" is defined in HRS § 712A-4 and, as previously quoted, states:

**Covered offenses.** Offenses for which property is subject to forfeiture under this chapter are:

(a) All offenses which specifically authorize forfeiture;

(b) Murder, kidnapping, gambling, criminal property damage, robbery, bribery, extortion, theft, unauthorized entry into motor vehicle, burglary, money laundering, trademark counterfeiting, insurance fraud, promoting a dangerous, harmful, or detrimental drug, or commercial promotion of marijuana, which is chargeable as a felony offense under state law;

(c) The manufacture, sale, or distribution of a controlled substance in violation of chapter 329, promoting detrimental drugs or intoxicating compounds, promoting pornography, promoting pornography for minors, or promoting prostitution, which is chargeable as a felony or misdemeanor offense, but not as a petty misdemeanor, under state law; and

(d) The attempt, conspiracy, solicitation, coercion, or intimidation of another to com-

mit any offense for which property is subject to forfeiture.

(Bold emphasis in original.) (Underscored emphases added.) The ICA, however, reasoned that the definition contained in HRS § 712A–1 "makes clear that a provision such as HRS § 199–7 which 'relat[es] to' the covered offense, and provides for forfeiture for a violation of it, is sufficient." *One Boat,* 118 Hawai'i at 115, 185 P.3d at 863 (brackets in original).

Based on a plain reading, HRS § 712A–1 envisions two separate categories of "covered offenses," one being "any crime set forth in section 712A–4" and the other, "any other offense for which forfeiture is provided by the law relating to a particular offense." Standing alone, the latter phrase—"any other offense for which forfeiture is provided by the law relating to a particular offense"— may appear ambiguous because of the lack of reference to section 714A–4 as in the former phrase. However, when reading HRS § 712A–1 *in pari materia* with HRS § 712A–4, as this court is required to do, it is clear that (1) "any crime set forth in section 712A–4" refers to those crimes specifically enumerated in subsections (b) through (d) of HRS § 712A–4 and (2) "any other offense for which forfeiture is provided by the law relating to a particular offense" refers to those offenses in HRS § 712A–4(a), *i.e.,* "all offenses which specifically authorize forfeiture." Thus, we conclude that the definition of "covered offense" contained in HRS § 712A–1 does not broaden or contradict the definition found in HRS § 712A–4; both definitions are consistent and parallel each other. Consequently, the ICA's reliance on the phrase "relat[es] to" is unavailing. Accordingly, inasmuch as HRS §§ 712A–4(b) through –4(d) are clearly inapplicable under the facts of this case, the relevant inquiry is whether the offenses described in HAR §§ 13–95–70 and 13–95–71 "specifically authorize forfeiture."

■ At the time the offenses in the instant case were allegedly committed, HAR §§ 13–95–70 and 13–95–71 plainly stated that the intentional taking of stony coral and live rocks was prohibited without a permit. However, both regulations were silent as to the penalty for violating either or both regulations. The "Rules Regulating the Taking and Selling of Certain Marine Resources," promulgated by the DLNR, of which HAR §§ 13–95–70 and 13–95–71 are a part, contained a penalty section, which stated that "[a] person violating [these rules] shall be punished as provided by law." HAR § 13–95–2 (1998). Clearly, neither HAR §§ 13–95–70 and 13–95–71 nor the aforementioned penalty section contain any language relating to forfeiture. Thus, nothing in the administrative regulations themselves "specifically authorize forfeiture."

However, as previously stated, HAR §§ 13–95–70 and 13–95–71 were authorized and implemented pursuant to HRS § 187A–5 (1993), which provides that, "[s]ubject to [C]hapter 91, [DLNR] shall adopt, amend, and repeal rules for and concerning the protection and propagation of introduced and transplanted aquatic life, or the conservation and allocation of the natural supply of aquatic life in any area." HRS § 187A–5 further provides that, "[a]ll rules shall have the force and effect of law. *Any person who violates any of the rules adopted pursuant to this section* shall be guilty of a petty misdemeanor and upon conviction thereof *shall be punished as provided by section 188–70.*" (Emphases added.) In turn, HRS § 188–70 provided in relevant part:

(a) Any person violating any provision of this chapter … or any rule adopted pursuant thereto, is guilty of a petty misdemeanor and, in addition to any other penalties, shall be fined not less than:

(1) $100 for a first offense;

(2) $200 for a second offense; and

(3) $500 for a third or subsequent offense.

Based on a plain reading of the aforementioned statutes, the only punishments allowed for a violation of HAR §§ 13–95–70 and 13–95–71 are the fines listed in HRS § 188–70 or "any other penalty," HRS § 188–70, or any punishment "permitted by law," HAR § 13–95–2. Accordingly, we next examine whether forfeiture can be considered "any other penalty" or a punishment "permitted by law."

As previously discussed, the State's position is grounded in HRS § 199–7 as the law permitting forfeiture as a penalty in this case. Clearly, the ICA agreed. However, both the State and the ICA ignored the plain language in HRS § 199–7(b) that "[a]ny equipment, . . . vessel, . . . or natural resource seized *is subject to forfeiture pursuant to [C]hapter 712A.*" (Emphases added.) Again, HRS § 712A–4(a) requires that items subject to forfeiture are those seized in connection with "offenses which specifically authorize forfeiture." Thus, had the legislature *not* included the reference to Chapter 712A in HRS § 199–7, forfeiture could be considered an "other penalty" and/or a punishment "permitted by law (*i.e.*, HRS § 199–7)." In fact, the inclusion of the reference to Chapter 712A is consistent with the plain language of HRS § 712A–4(a)'s requirement that items subject to forfeiture are those seized in connection with "offenses which specifically authorize forfeiture." Consequently, the ICA was incorrect in stating that,

> [u]nder [the Trans'] interpretation, the legislature's approach in 1989 [ (amending HRS § 199–7) ], *i.e.*, including a single authorization for the seizure and forfeiture of natural resources in HRS § 199–7, *would have been inconsistent* with its purported intent in 1988 [ (adoption of chapter 712A) ] to require that such authorization appear in each individual statute or rule to which it applied.

*One Boat,* 118 Hawai'i at 119, 185 P.3d at 867 (emphasis added). Likewise, the ICA's view that, "under [the Trans]' interpretation, the provisions in HRS § 199–7 authorizing forfeiture would be superfluous," *id.* at 116, 185 P.3d at 864 (citation omitted), is also incorrect.

▪ Indeed, a review of other administrative regulations promulgated pursuant to Title 12, supports the opposite conclusion, *i.e.*, that the legislature did *not* intend forfeiture to apply to all violations of Title 12. The DLNR, has explicitly specified forfeiture as a penalty, consistent with section 714A–4(a)'s requirement that the offense specifically authorize forfeiture. To illustrate, HAR § 13–122–12 (1999), entitled "Rules Regulating Game Bird Hunting, Field Trials, and Commercial Shooting Preserves," and HAR § 13–123–22 (1999), entitled "Rules Regulating Game Mammal Hunting," were both promulgated by the DLNR pursuant to HRS §§ 183D–3 and 183D–4 and each identically provides in relevant part that:

> Persons found to be in violation of any provision of this chapter may have their hunting privileges revoked by the department, after notice and hearing. [DLNR] may reinstate revoked hunting privileges upon subsequent completion of a State-approved hunter education course. *Any equipment, article, instrument, aircraft, vehicle, vessel, business record or natural resource used or taken in violation of the provisions of this chapter may be seized and subject to forfeiture as provided by [HRS] section 199–7 and chapter 712A.*

HAR §§ 13–122–12(f)(3) and 13–123–22(g)(3) (emphases added). The foregoing specific authorizations for forfeiture carved out by the DLNR would be rendered superfluous were this court to adopt the ICA's view that the legislature, in enacting and amending HRS § 199–7, intended forfeiture to apply to all violations of Title 12. Accordingly, based on a plain reading of the subject regulations at issue, we conclude that unless the offense is one of those enumerated in subsections (b) through (d) of HRS § 712A–4, the offense must "specifically authorize forfeiture" as required by HRS § 712A–4(a) in order to render the taking of the property lawful, and, as previously discussed, neither HAR §§ 13–95–70 nor 13–95–71 specifically authorize forfeiture. Consequently, we hold that the ICA erred in vacating the circuit court's orders and judgment.

Inasmuch as the foregoing analysis is based entirely on the plain language of the statutes and regulations at issue, any discussion regarding legislative history is unnecessary.[9] *See Klie,* 116 Hawai'i at 526, 174 P.3d

---

**9.** In fact, we note that the ICA specifically concluded that "HRS § 199–7 *unambiguously* provides that property used in violation of [t]itle 12 and the rules adopted thereunder is subject to seizure and forfeiture[,]" *One Boat,* 118 Hawai'i at 115, 185 P.3d at 863 (emphasis added), and that, "when HRS § 712A–4 is read in light of the other provisions of [c]hapter 712A and [t]itle 12,

at 365 ("where the statute is clear and unambiguous, [this court] is bound by its plain and unambiguous language"). The ICA, in the instant case, also determined that the language of the relevant statutes and regulations was clear and unambiguous, but, nevertheless, asserted that "the plain language of HRS § 199–7 and Chapter 712A ... establish[ed] that the legislature intended to authorize the forfeiture of property used to violate rules adopted pursuant to Title 12 such as those at issue here." *One Boat*, 118 Hawai'i at 119, 185 P.3d at 867. Despite its reliance on the plain language, the ICA looked to the legislative history of HRS § 199–7 and Chapter 712A for additional support for its conclusion. *Id.* at 114, 119, 185 P.3d at 862, 867. Thus, inasmuch as reasonable minds can differ as to the plain meaning of the relevant statutes and regulations as evinced by our differing interpretations and recognizing that the result reached by the ICA may be appealing, especially when considering the legislature's recognition that certain individuals continue to violate the conservation law and rules despite the DLNR's enforcement efforts to conserve and protect Hawai'i's natural resources, we examine the ICA's reliance on the legislative history.

HRS § 199–7 was originally promulgated in 1978 and has since been amended eight times, the last having occurred in 2004 (2004 Haw. Sess. Laws Act 142, § 14 at 609, 614).[10] As originally promulgated, section 199–7 provided:

> **Seizure and forfeiture of equipment.** Any equipment, article, or instrument used or possessed in violation of title 12 and rules and regulations promulgated thereunder, is declared to be a public nuisance and subject to seizure by any enforcement officer of the department of land and natural resources, or by any police officer; and *upon conviction* of the person having possession or control of such equipment, article or instrument for a violation of any provision of such laws or rules and regulations, the equipment, article or instrument may be declared by the court to be forfeited to the State. Any property so forfeited shall be turned over to the department of land and natural resources and destroyed, if illegal, or otherwise shall be sold at public auction in the judicial circuit in which it was seized, the auction to be held once annually at a place and time to be designated by the department and notice thereof to be published in a newspaper of general circulation within the judicial circuit at least once before the auction, the first publication to be not less than twenty days prior to the auction. The auction shall be conducted by a person other than an employee of the department but designated by the department.

1978 Haw. Sess. Laws Act 171, § 1 at 354 (bold emphasis in original and italicized emphasis added). The purpose of the legislation was

> to establish a conservation and resources enforcement program within the [DLNR], for enforcement of laws, rules and regulations under Title 12[.] At present, five divisions and the [DLNR's] planning office have enforcement responsibilities. This [legislation] is intended to consolidate and coordinate the enforcement of all rules and regulations covering all State lands and any other lands and waters subject to the jurisdiction of the [DLNR].

Sen. Stand. Comm. Rep. No. 178–78, in 1978 Senate Journal at 855; *see also* Sen. Stand. Comm. Rep. No. 489–78, in 1978 Senate Journal at 976 (reiterating the above-quoted stated purpose).

In 1983, section 199–7 was amended "to enhance the program activities of the Division of Conservation and Resources Enforcement [ (DOCARE) ], [DLNR]." Sen. Stand. Comm. Rep. No. 232, in 1983 Senate Journal

---

*there is no ambiguity." Id.* at 116, 185 P.3d at 864 (emphasis added). It, nevertheless, delved into the legislative history based upon this court's pronouncement in *Bowers v. Alamo Rent–A–Car*, 88 Hawai'i 274, 282, 965 P.2d 1274, 1282 (1998) (Ramil, J., concurring), that subsequent legislative history or amendments may be examined to confirm the appellate court's statutory interpretation.

**10.** The amendment made in 2004 is not relevant to the case at bar inasmuch as the incident in question occurred in October 2000 and, thus, has not been included in the discussion herein.

at 1143. As enacted, section 199–7 provided (new material underscored; deleted material bracketed and stricken):

> **Seizure and forfeiture of [equipment.] certain property.** Any equipment, article, [or] instrument, aircraft, vehicles, or vessels, used or possessed in violation of title 12 and rules [and regulations promulgated] adopted thereunder, is declared to be a public nuisance and subject to seizure by any enforcement officer of the department of land and natural resources or by any police officer; and upon conviction of the person having possession or control of such equipment, article, [or] instrument, aircraft, vehicles, or vessels, for a violation of any provision of [such] the laws or rules [and regulations], the equipment, article, [or] instrument, aircraft, vehicles, or vessels, may be declared by the court to be forfeited to the State[.] in accordance with the procedure set forth in the Hawai'i Penal Code.[11] Any property so forfeited shall be turned over to the department of land and natural resources and destroyed, if illegal, or otherwise shall be sold at

public auction in the judicial circuit in which it was seized, the auction to be held once annually at a place and time to be designated by the department and notice thereof to be published in a newspaper of general circulation within the judicial circuit at least once before the auction, the first publication to be not less than twenty days prior to the auction. The auction shall be conducted by a person other than an employee of the department but designated by the department.

1983 Haw. Sess. Laws Act 99, § 1 at 171 (underscored and bold emphases in original) (strike out formatting added). Another purported purpose of the amendment was to provide DLNR with the option "to retain and use the forfeited property when declared by the court to be forfeited to the State in accordance with the procedures set forth in the Hawai'i Penal Code." Hse. Stand. Comm. Rep. No. 721, in 1983 House Journal at 1174. Curiously, however, such option does not appear in the 1983 language, but does in the 1985 amendment. *See* 1985 Haw. Sess. Laws Act 222, § 1 at 402–03.[12]

**11.** In 1983, HRS § 701–119 (1985) provided in relevant part:

> **Procedure for forfeiture.** (1) Applicability of procedure. Whenever a forfeiture is provided for by this Code, or is otherwise provided for by the law relating to a particular offense or the enforcement of penal laws in general, the procedure for forfeiture shall be set forth in this section, unless a different procedure is otherwise provided by law.
>
> (2) When forfeiture is ordered. Subject to the requirements of subsection (4) [ (governing notice) ], when forfeiture is authorized by law, it may be ordered by the court upon:
>
> (a) Motion by the State for forfeiture following the conviction of a person for an offense based on his unlawful possession, use, or other acts with respect to the thing that is forfeited; or
>
> (b) An action for an *in rem* for forfeiture brought by the State upon a complaint alleging that a person, known or unknown, unlawfully possessed, used, or otherwise acted with respect to the thing that is forfeited.

The commentary to HRS § 701–119 stated: "This section permits forfeitures following appropriate convictions and, in those cases where convictions cannot be obtained because, for example, the offender has fled or is unknown, following an action *in rem* against the thing to be forfeited."

**12.** As enacted, the 1985 version provided (new material underscored; deleted material bracketed and stricken):

> **Seizure and forfeiture of certain property.** Any equipment, article, instrument, aircraft, [vehicles,] vehicle, or [vessels,] vessel, used or possessed in violation of title 12 and rules adopted thereunder, is declared to be a public nuisance and subject to seizure by any enforcement officer of the department of land and natural resources or by any police officer; and upon conviction of the person having possession or control of such equipment, article, instrument, aircraft, [vehicles,] vehicle, or [vessels,] vessel, for a violation of any provision of the laws or rules, the equipment, article, instrument, aircraft, [vehicles,] vehicle, or [vessels,] vessel, may be declared by the court to be forfeited to the State in accordance with the procedure set forth in [the Hawai'i Penal Code.] section 701–119. Any [property] equipment, article, instrument, aircraft, vehicle, or vessel so forfeited shall be turned over to the department of land and natural resources and destroyed, if illegal, or [otherwise] may be kept and retained and utilized by the department of land and natural resources or any other state agency, or if not needed or required by the department of other state agency, shall be sold at public auction in the judicial circuit in which it was seized, the auction to be held

As support for its position that "the legislature intended [HRS] § 199–7 to authorize forfeiture for violations of [Title] 12 and the rules adopted thereunder," the ICA points specifically to the language contained in the original 1978 version of HRS § 199–7, *i.e.*, (1) that "any equipment, article, or instrument used or possessed in violation of Title 12 and rules and regulations thereunder, is declared to be a public nuisance and subject to seizure . . ." and, (2) "*upon conviction of the person* having control of such equipment, article[,] or instrument for a violation of any provision of such laws or rules and regulations, the equipment, article or instrument may be declared by the court to be forfeited to the State." *One Boat*, 118 Hawai'i at 116, 185 P.3d at 864 (emphasis added). Although the aforementioned "public nuisance" and "upon conviction" language is contained in the 1978, 1983, and 1985 versions of HRS § 199–7, such language (as discussed more fully *infra*) was deleted in 1989. In other words, prior to 1989, conviction was a prerequisite to forfeiture; after 1989, it is not. The deletion of the public nuisance/conviction language is particularly significant in the context of the two distinct types of forfeiture recognized by law: *in personam* and *in rem*. Under *in personam* forfeiture actions, the forfeiture of property is "a part, or at least a consequence, of the judgment of conviction." *The Palmyra*, 25 U.S. (12 Wheat.) 1, 9, 6 L.Ed. 531 (1827). Conversely, *in rem* forfeiture is not intended to be a consequence of conviction, but is entirely separate from the judgment of conviction. In other words, *in rem* forfeitures were "not considered punishment against the individual for an offense," *United States v.*

*Bajakajian*, 524 U.S. 321, 331, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998); rather, it is the "thing[, *i.e.*, the property, that] is . . . primarily considered as the offender, or rather the offence [sic] is attached primarily to the thing," *Palmyra*, 25 U.S. at 9. The pre–1989 versions of HRS § 199–7 clearly require conviction prior to forfeiture and, thus, provide solely for *in personam* forfeiture. As discussed *infra*, in 1989, the legislature deleted any reference in HRS § 199–7 to conviction as a prerequisite to forfeiture and instead provided that property seized be "subject to forfeiture pursuant to [C]hapter 712A." Chapter 712A includes provisions for both *in rem* and *in personam* forfeiture.[13] The ICA, however, apparently overlooked the aforementioned distinction inasmuch as its relied explicitly on the pre–1989 versions of HRS § 199–7 as support for its holding that the current version of HRS § 199–7 is intended as a blanket authorization of forfeiture for violations of Title 12. In our view, the ICA's reliance on the pre–1989 versions of HRS § 199–7 is unavailing inasmuch as they clearly interposed conviction as a precondition to forfeiture and, thus, are substantively different from the current version of HRS § 199–7.

In 1989, the subject statute was again amended "to clarify an area where the authority of an agent of the [DLNR] to confiscate unlawfully acquired natural resources is unclear. This bill allows the search, seizure and forfeiture of 'natural resources[.]'" Sen. Stand. Comm. Rep. No. 1290, in 1989 Senate Journal at 1284; *see also* Hse. Stand. Comm. Rep. No. 631, in 1989 House Journal at 1064 (reiterating the aforementioned purpose).[14]

once annually at a place and time to be designated by the department and notice thereof to be published in a newspaper of general circulation within the judicial circuit at least once before the auction, the first publication to be not less than twenty days prior to the auction. The auction shall be conducted by a person other than an employee of the department but designated by the department.

The department of land and natural resources shall compile a list of all equipment, articles, instruments, aircraft, vehicles, or vessels forfeited as provided in this section and shall publish the list in its annual report.

1985 Haw. Sess. Laws Act 222, § 1 at 403 (underscored and bold emphases in original) (strike out formatting and italicized emphasis added).

13. HRS § 712A–13 (1993 and Supp.2007) provides in relevant part:

**Judicial in personam forfeiture proceedings.** (1) If a forfeiture is authorized by law, it shall be ordered by a court on a petition for forfeiture filed by the prosecuting attorney in an in personam civil or criminal action. . . .

. . . .

(6) On a determination of liability or the conviction of a person for conduct giving rise to forfeiture under this title, the court shall enter a judgment of forfeiture of the property described in the petition for forfeiture[.]

14. It should be noted here that HRS chapter 712A was enacted in 1988. *See* 1988 Haw. Sess.

As enacted, section 199-7 provided (new material underscored; deleted material bracketed and stricken):

[~~Seizure~~] <u>Search</u> and <u>seizure; forfeiture of</u> [~~certain~~] property. [~~Any equipment, article, instrument, aircraft, vehicle, or vessel, used or possessed in violation of title 12 and rules adopted thereunder, is declared to be a public nuisance and subject to seizure by any enforcement officer of the department of land and natural resources or by any police officer; and upon conviction of the person having possession or control of such equipment, article, instrument, aircraft, vehicle, or vessel, for a violation of any provision of the laws or rules, the equipment, article, instrument, aircraft, vehicle, or vessel, may be declared by the court to be forfeited to the State in accordance with the procedure set forth in section 701-119. Any equipment, article, instrument, aircraft, vehicle, or vessel so~~] <u>(a) Any police officer or agent of the department of land and natural resources upon whom the board of land and natural resources has conferred powers of police officers, shall have the authority to conduct searches on probable cause as provided by law and to seize any equipment, article, instrument, aircraft, vehicle, vessel, business records, or natural resource used or taken in violation of the provisions contained in chapter 6E or title 12, or any rules adopted thereunder. For purposes of this section, "natural resource" includes any archaeological artifacts, minerals, any aquatic life or wildlife or parts thereof, including their eggs, and any land plants or parts thereof, including seeds.</u>

<u>(b) Any equipment, article, instrument, aircraft, vehicle, vessel, business records, or natural resource seized is subject to forfeiture pursuant to chapter 712A. Notwithstanding section 712A-16 or any other law to the contrary, any natural resource forfeited shall be turned over to the department of land and natural resources for disposition as determined by that department</u> and <u>may be</u> destroyed, if illegal, or may be kept and retained and utilized by the department of land and natural resources or any other state agency, or if not needed or required by the department or other state agency, [~~shall~~] <u>may</u> be sold at public auction in the judicial circuit in which it was seized, the auction to be held once annually at a place and time to be designated by the department and notice thereof to be published in a newspaper of general circulation within the judicial circuit at least once before the auction, the first publication to be not less than twenty days prior to the auction. The auction shall be conducted by a person other than an employee of the department but designated by the department.

<u>(c)</u> The department of land and natural resources shall compile a list of all equipment, articles, instruments, aircraft, vehicles, [~~or~~] vessels, <u>or any natural resource</u> forfeited as provided in this section and shall publish the list in its annual report.

Laws Act 260, § 1 at 457–72. Introduced as H.B. No. 2080, the purpose of the legislation was to "authorize the forfeiture of property used in the furtherance *of specified offenses* and to thereby deprive criminals of the profits of criminal activities." Hse. Stand. Comm. Rep. No. 2–88, in 1988 House Journal at 849 (emphasis added). The House Committee on Judiciary observed that, based on testimony from the Honolulu Police Department and the Department of the Prosecuting Attorney, "the provisions proposed in the bill would *clarify the offenses giving rise to forfeiture,* the property subject to forfeiture, the procedures for forfeiture, and the disposition of forfeiture proceeds." *Id.* (emphasis added).

Moreover, we note that between 1991 and 2006, the legislature amended Chapter 712A eight times, seven of which involved the addition of specific offenses to those enumerated in HRS §§ 712A-4(b) through –4(d), to wit: (1) "money laundering," 1991 Haw. Sess. Laws Act 166, § 1 at 429–37; (2) "trademark counterfeiting," 1997 Haw. Sess. Laws Act 277, § 3 at 613–614; (3) "insurance fraud," 1998 Haw. Sess. Laws Act 155, § 4 at 569–70; (4) "unauthorized entry into a motor vehicle," 1998 Haw. Sess. Laws Act 307, § 1 at 988–89; (5) "promoting child abuse, or electronic enticement of a child," 2002 Haw. Sess. Laws Act 200, § 4 at 845; (6) "sexual exploitation of a minor," 2002 Haw. Sess. Laws Act 240, §§ 5 and 11 at 949–53; and (7) "unlawful methamphetamine trafficking, manufacturing of a controlled substances with a child present," 2006 Haw. Sess. Laws Act 7, § 1 at 7–8. These amendments clearly evince the legislature's belief that forfeiture is applicable only when the offense "specifically authorize[s] forfeiture," HRS § 712A-4(a), or involves conviction of one of the offenses specifically delineated in subsections (b) through (d).

1989 Haw. Sess. Laws Act 122, § 1 at 241 (underscored and bold emphases in original) (strike out formatting added).[15]

The 1999 amendments to HRS § 199–7 are especially relevant inasmuch as the resulting version is the one applicable to the case at bar. As enacted, section 199–7 provided (new material underscored; deleted material bracketed and stricken):

**Search and seizure; forfeiture of property.** (a) Any police officer or agent of the department of land and natural resources upon whom the board of land and natural resources has conferred powers of police officers, shall have the authority to conduct searches on probable cause as provided by law and to seize any equipment, article, instrument, aircraft, vehicle, vessel, business records, or natural resource used or taken in violation of the provisions contained in chapters 6E and 6K, or title 12, or any rules adopted thereunder. For purposes of this section, "natural resource" includes any archaeological artifacts, minerals, any aquatic life or wildlife or parts thereof, including their eggs, and any land plants or parts thereof, including seeds.

(b) Any equipment, article, instrument, aircraft, vehicle, vessel, business records, or natural resource seized is subject to forfeiture pursuant to chapter 712A. [Notwithstanding section 712A–16 or any other law to the contrary, any natural resource forfeited shall be turned over to the department of land and natural resources for disposition as determined by that department and may be destroyed, if illegal, or may be kept and retained and utilized by the department of land and natural resources or any other state agency, or if not needed or required by the department of other state agency, may be sold at public auction in the judicial circuit in which it was seized, the auction to be held once annually at a place and time to be designated by the department and public notice thereof to given within the judicial circuit at least once before the auction, the first notice to be not less than twenty days prior to the auction. The auction shall be conducted by a person other than an employee of the department but designated by the department.] Unless otherwise directed by the court pursuant to chapter 712A, any item, other than a natural resource, seized shall be ordered forfeited to the State for disposition as determined by the department, or may be destroyed, or may be kept and retained and utilized by the department or any other state agency. If not needed or required by the department or other state agency, the forfeited items shall be disposed of as provided by chapter 712A. Notwithstanding any other law to the contrary, any live natural resource seized may be immediately returned to its natural environment or suitable habitat or may be disposed of as determined by the department; provided that if the natural resource disposed of was unlawfully seized, the department shall be liable to the owner for the fair market value of the items disposed of.

(c) The department of land and natural resources shall compile a list of all equipment, articles, instruments, aircraft, vehicles, vessels, or any natural resource forfeited as provided in this section and shall publish the list in its annual report.

(d) Notwithstanding any other law to the contrary, the department of land and natural resources may sell or take actions to cause the sale of any perishable natural resource that is seized to prevent the waste of the natural resource and to ensure the economic value of such natural resource; provided that the department may not sell or cause the sale of any threatened or endangered species or any

---

**15.** Curiously, the legislature amended section 199–7 a second time in 1989, *see* 1989 Haw. Sess. Laws Act 261, § 9 at 574, 576–77, to remove the reference to "section 701–119" in subsection (a) and replace it with "chapter 712A" because section 701–119 had been repealed the year before. Sen. Stand. Comm. Rep. No. 1324, § 9, in 1989 Senate Journal at 1302. Such an amendment, however, appears to have been un-

necessary in light of the complete replacement of subsection (a) via Act 122.

Additionally, we note here that section 199–7 was amended in 1997 (1997 Haw. Sess. Laws Act 17, § 4 at 20–22) and in 1998 (1998 Haw. Sess. Laws Act 2, § 53 at 3, 33–34), which amendments do not impact the issues in this case and, therefore, are not discussed here.

other species whose sale is prohibited by law. The department of land and natural resources may require the person or persons who took the natural resources to sell the seized natural resources at fair market value. The department of land and natural resources may require any person purchasing any seized natural resource to deliver the proceeds of the sale to the department of land and natural resources or its authorized representative. Any person who refuses to sell the seized natural resources at fair market value or any person who fails to deliver the proceeds of the sale, as directed by the department of land and natural resources, shall be in violation of this subsection and punishable as provided by law. The department of land and natural resources shall deposit and keep the proceeds of the sale in an interest bearing account until such time as the suspected violation is settled between the person or persons who took the natural resource, consignee or consignees, if any, and the department of land and natural resources. Should a settlement not be reached, the department of land and natural resources shall submit the proceeds of the sale to the court. The proceeds of the sale, after deducting any reasonable costs of the sale incurred by the department of land and natural resources, shall be subject to any administrative or judicial proceedings in the same manner as the seized natural resource would have been, including an action in rem for the forfeiture of the proceeds. Seizure and sale of a natural resource is without prejudice to any other remedy or sanction authorized by law.

1999 Haw. Sess. Laws Act 233, § 1 at 720–21 (underscored and bold emphases in original) (strike out formatting added). The purpose of the aforementioned amendments was to "specify that the [DLNR] may require persons who illegally took perishable natural resources to sell those resources at fair market value with the proceeds turned over to the department[ ] . . . and [to] ensure[ ] that the resource itself is not wasted." Sen. Stand. Comm. Rep. No. 1567, in 1999 Senate Journal at 1638; see also Hse. Stand. Comm. Rep. No. 948, in 1999 House Journal at 1380–

81 (stating that "procedures to manage perishable seized natural resources by timely sale of the items will prevent waste of valuable resources").

The ICA concluded that the aforementioned "committee reports make clear that *the legislature intended to provide DLNR with the authority to seize **and forfeit** 'natural resources[,]' " One Boat,* 118 Hawai'i at 118, 185 P.3d at 866 (emphasis added), but failed to address the apparent contradiction between its aforementioned conclusion and the language in HRS § 199–7(b) that "any item, *other than a natural resource,* seized shall be ordered forfeited to the State for disposition as determined by the department[.]" *Id.* (emphasis added). In our view, under HRS § 199–7, if forfeiture is allowed and involves a natural resource, such forfeiture may be made without court order; otherwise, a non-natural resource is subject to disposition by the courts pursuant to the requirements of Chapter 712A. *See* HRS § 712A–10 (Supp.2007) (authorizing the prosecuting attorney to initiate administrative forfeiture proceedings); HRS § 712A–12 (1993) (providing that, *"[i]f a forfeiture is authorized by law,* it shall be ordered by a court on an action *in rem* brought by the prosecuting attorney on a verified petition for forfeiture" (emphasis added)). The aforementioned view is supported by the inclusion of subsection (d), which—in addition to the specific procedures for selling perishable natural resources—provides that "[t]he proceeds of the sale, after deducting any reasonable costs of the sale incurred by the [DLNR], shall be subject to any administrative or judicial proceedings in the same manner as the seized natural resource would have been, including an action *in rem* for the forfeiture of the proceeds." HRS § 199–7(d) (Supp.2000).

In sum, the legislative history of HRS § 199–7 does not support the view that section 199–7 operates as a blanket authorization for forfeiture, or authorizes forfeiture for all Title 12 offenses, regardless of the lack of a specific authorization for forfeiture delineated within the offense itself or the absence of the offense in the enumerated list. Accordingly, the foregoing legislative history

demonstrates that: (1) if forfeiture is authorized and the item being forfeited involves a natural resource, the DLNR has authority to seize for forfeiture perishable natural resources without adhering to the judicial procedures set forth in Chapter 712A, *see* HRS § 712A–6(1)(c)(v) (Supp.2007) (providing that a law enforcement officer may make a seizure for forfeiture "without court process" where "[t]he seizure for forfeiture is of perishable natural resources seized and sold, pursuant to section 199–7, prior to forfeiture proceeding"); and (2) forfeiture of non-natural resources obtained from the commission of a "covered offense" is subject to the requirements of Chapter 712A, *see* HRS § 712A–5 (1993 and Supp.2007) (describing property subject to forfeiture, including, *inter alia*, "(a) [p]roperty described in a statute authorizing forfeiture, (b) [p]roperty used or intended for use in the commission of, attempt to commit, or conspiracy to commit a covered offense, or which facilitated or assisted such activity" and "(f) [a]ny property derived from any proceeds which were obtained directly or indirectly from the commission of a covered offense").

## IV. *CONCLUSION*

Based on the foregoing, we hold that: (1) the ICA had jurisdiction over the State's appeal; (2) HAR §§ 13–95–70 and 13–95–71 are not covered offenses within the meaning of HRS § 712A–4; and (3) the State's forfeiture of the Trans' property was, therefore, unauthorized. Accordingly, we reverse the ICA's March 17, 2008 judgment on appeal and affirm the circuit court's February 1, 2002 order, December 6, 2004 judgment, and January 20, 2005 order.

