98 P.3d 265

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Michael Damien MILLER,
Defendant–Appellant.**

No. 25668.

Intermediate Court of Appeals of Hawai'i.

Aug. 27, 2004.

James S. Tabe, Deputy Public Defender, State of Hawai'i, on the briefs, for defendant-appellant.

Mary Ann J. Holzl–Davis, Deputy Prosecuting Attorney, County of Hawai'i, on the briefs, for plaintiff-appellee.

LIM, Acting C.J., FOLEY and NAKAMURA, JJ.

Opinion of the Court by LIM, Acting C.J.

Michael Damien Miller (Miller) appeals the February 6, 2003 judgment of the family court of the third circuit, the Honorable Terence T. Yoshioka, judge presiding, that convicted him of abuse of a family or household member, a violation of Hawaii Revised Statutes (HRS) § 709–906(1) (Supp.2001).[1] Mil-

---

1. Hawaii Revised Statutes (HRS) § 709–906(1) (Supp.2001) provides in pertinent part that, "It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member.... For the purposes of this section, 'family or household member' means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit." *See also* HRS § 702–204 (1993) ("When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect there-

to, a person acts intentionally, knowingly, or recklessly"); *State v. Eastman*, 81 Hawai'i 131, 140, 913 P.2d 57, 66 (1996) (pursuant to HRS § 702–204, "the requisite state of mind for a violation of HRS § 709–906(1) is that of acting intentionally, knowingly, or recklessly"); *State v. Tomas*, 84 Hawai'i 253, 257, 933 P.2d 90, 94 (App.1997) ("to 'physically abuse' someone under HRS § 709–906(1) means to maltreat in such a manner as to cause injury, hurt or damage to that person's body" (citations and some internal quotation marks omitted)); *State v. Nomura*, 79 Hawai'i 413, 415–16, 903 P.2d 718, 720–21 (App. 1995) (in a prosecution for abuse of family or

ler contends there was insufficient evidence adduced at his bench trial to disprove the *soi-disant* "parental discipline" defense. We disagree, and affirm.

## I. Background.

On October 17, 2001, a complaint was filed against Miller, alleging that the day before, he had physically abused the eleven-year-old complaining witness (the CW), who is his nephew. The essential evidence presented at Miller's November 1, 2002 trial follows.

The CW, who lived with his grandparents and Miller, testified that Miller picked him up from school at around three in the afternoon on October 16, 2001. Miller usually picked him up from school on Tuesdays and Wednesdays because those days the CW's grandmother, Miller's mother, was working. The CW remembered he had already experienced a "bad day" at school that day. As they drove home, Miller was tickling him. Although the CW told Miller many times to stop, he would not stop. Whenever the CW grabbed Miller's arm to make him stop, Miller would hit him. Miller also refused to turn down the car radio when the CW told him it was aggravating a headache, instead turning it even louder. The CW got "really mad" at Miller. When they stopped at a gas station, the CW got out and walked away. After the CW had gotten about a hundred yards away, he noticed that Miller and the car were gone, so he turned around and walked back to the gas station to call his grandfather to pick him up.

Then, however, the CW saw Miller driving back. The CW turned around, but Miller walked towards him and started yelling at him. Miller pushed the CW down on the ground. "Oh, he was just swearing at me, yelling at me and telling me to get back in the car and stuff like that." The CW sat there cross-legged and refused to get back in the car. Miller attempted to pick the CW up by the ear, and by the hair, but each time the CW fell back down. Miller then started kicking the CW. "Not really hard, but he was kicking me." Miller hit the CW with his fist,

"Five times, maybe. I don't know." "Like on my face or in my ribs or something like that, or maybe in the back." "And he started throwing rocks, but not really at me." The CW could see that Miller was angry. "Yeah, he was mad. He was very mad." The CW was crying and very upset. "Well, some people started coming around. And my uncle started leaving me alone and trying to get the other people to go away. And then some other guy [intervened] and got into a fist fight with my uncle. And then the police came and stopped it."

After the incident, the CW rode in an ambulance to the hospital to be examined. The CW remembered he had injuries to his head. "Yeah, I had a bump over here from when my head hit the ground. Because he kept on trying to pick me up, but then he just dropped me. And then behind my ears, when he tried to pick me up, he grabbed me by my ears, so there would be nail marks all over here." The CW's head was "kind of sore, but not really, really sore." The next day at school, the CW's back and ribs were hurting.

Police officer Iris McGuire (Officer McGuire) recalled that when she arrived on the scene, she saw the CW being walked to the ambulance. He was "crying and real excited." "He was completely red, and it seemed—he complained to me about being in pain. And I observed scratches to the right side of his facial area and ears. And he told me his head hurt. And when I touched the back of his head, he had a lump on his head." Officer McGuire also noticed that Miller's head was bleeding from injuries inflicted by the intervenor. When the CW told her what had happened, Officer McGuire informed Miller that he would be placed under arrest. After Miller was treated at the hospital, Officer McGuire took him into custody. While he was at the hospital, Miller admitted to Officer McGuire that he had grabbed the CW by the ear. Miller explained that the CW refused to get back in the car, and that he was "just trying to get him home." When

household members, jury instructions defining "physical abuse" as "causing bodily injury to another person[,]" and "bodily injury" as "physi-

cal pain, illness or any impairment of physical conditions [sic,]" were not incorrect (block quote format omitted)).

she was at the scene, Officer McGuire noticed an ICEE drink in Miller's vehicle.

Larry Larison (Larison), a gasoline tank truck driver, was making a delivery to the gas station when he saw a "scuffle" at some distance across the way. Miller was on top of the CW, "trying to pull him or move him or something, grabbing him." Larison saw Miller grabbing the CW, "just by his shirt, I think, or his hair or something. It looked like he was trying to pick him up, get him to come with him." Julie Ann DeGeer (DeGeer) was filling gas at the station. From about fifty feet away, she saw the altercation between Miller and the CW, whom she described as a "chubby little boy." DeGeer recounted, "I seen him hitting his head with closed fist and kicking him." She said Miller hit the CW in the face more than five times. The CW was crouched and crying, pleading with Miller to stop. "He was like all red." The "abuse" lasted so long that DeGeer approached and yelled at Miller to stop. "You know, that was too much beating for one person. I was like, what is going on here." But Miller looked so angry that DeGeer was reluctant to interfere. That is when the intervenor, a "young man about 16, 17 years old[,]" stepped in.

The CW's grandmother, Francine Miller (Mrs. Miller), testified for her son. She noted that she and her husband are "responsible" for the CW. "I'm his legal guardian, permanent custodian.... I think my husband and I are both." Mrs. Miller added that Miller "used to help me when I was working by picking up [the CW] from school." Miller would occasionally "watch" the CW as well. When Miller undertook these tasks, Mrs. Miller expected that he would be responsible for the CW's welfare or well-being. On the day of the incident, Mrs. Miller got a call at work from the hospital. When she arrived at the hospital, she saw the CW and Miller there. As for the CW, "The only thing I noticed was on his face.... He had a small, little cut on his cheek." She took him home from the hospital. The CW did not thereafter require further treatment, and he went to school the next day. On cross-examination, Mrs. Miller remembered that she did feel a lump on the back of the CW's head. "Not as big as a golf ball." Mrs. Miller told the deputy prosecuting attorney (DPA) that she usually disciplines the CW by confining him to his room, but admitted that she sometimes spanks him, "Usually on his butt or his legs. I'll just slap him.... He's a kid that drives me up the wall sometimes." Neither she nor her husband ever punches or kicks the CW. She never hits him in the face.

Miller was the other witness in his defense. Miller, 41, was a plumber, but is disabled with a neck and back injury. He remembered picking the CW up from school that day in his Jeep, as was his wont Tuesdays through Thursdays. Whenever he did so, he was "responsible" for the CW. They were then supposed to go for a ride, but neither Miller nor his Jeep was up to it that day. The CW looked "kind of tired, restless." So Miller attempted to cheer him up by buying him an ICEE. When Miller came out of the gas mart, the CW was gone. Miller spent about five minutes looking for the CW in the vicinity of the store. He then jumped in his Jeep and searched fruitlessly down the road. When Miller returned to the store, he caught a glimpse of the CW. He called out for him as he walked after him, but the CW just looked back at Miller and turned the corner. When Miller caught up with him, he yelled at him to get in the car, but the CW just sat on the ground. Miller yelled at him for a good ten minutes, to no avail. Miller then pulled at the CW's ear, not to injure him but as a come-along. In response, the CW just lay down on the ground. Miller yelled some more, grabbed the CW by the wrists, and tried to drag him, but could not due to his neck and back injury and the CW's 160 pounds. Miller let go of the CW, but continued to yell at him. All the while, the CW was "giggling and thinking it was a game." The CW was not crying.

Then, "this guy came up to me face to face.... And I didn't want him in my face so I pushed him back.... The police were there next thing I know." In the meantime, the CW had been led away by one of the store employees and was standing by, watching. "He thought it was a game, giggling and joking, I mean smiling, kind of." Miller told

the police officer the other guy had hit him. The police officer detained the intervenor, but only for a little while. The police officer made Miller ride in an ambulance to the emergency room because he had sustained an injury in the confrontation. "And some stitches had to be put in my eye." Miller was then arrested. Miller later moved out of his parents' house. When his lawyer asked him about his relationship with the CW, Miller replied, "Right now, we don't talk. He doesn't talk to me so I don't talk to him.... I wish we were—I wish we were the same way we were.... Going out, picking maile, doing things."

On cross-examination, Miller acknowledged that he was tickling the CW in the car and did not stop when the CW asked, but denied hitting him when he pushed his hand away. Miller maintained he was tickling the CW in order to make him laugh and "take him out of his bad day." When the DPA alleged that the CW left the car because he was afraid, Miller responded, "No. He knows I would never raise a hand to him." Miller reiterated that the CW was laughing and taking it all as a game, and again denied that the CW was crying.

After closing arguments, the family court took the matter under advisement. The family court announced its verdict at a hearing held on November 20, 2002:

At the last hearing the Court had some concerns regarding the applicability of Mr. Miller's use of force defense.

And upon reflection, the Court has decided to announce its own decision based upon what the Court believes is common sense and is not gonna rely upon decisions reached in other jurisdictions. In other words, the Court feels that there are two bases for its decision which the Court will announce.

As previously noted, the State—the Court has found that the State has proved beyond a reasonable doubt that the defendant physically abused [the CW] on October 16, 2001 in Keaau, Hawaii. And that at the time that the abuse occurred, the defendant and the victim were both residing in the same home with the defendant's parents so it [sic] was a household member. And that when the defendant abused the victim, he did so intentionally and knowingly.

The issue that was before the Court was whether the State had disproved beyond a reasonable doubt the use of force defense under Section 703–309, Hawaii Revised Statutes [(HRS)] that was presented by the defense. And if not, whether the use of force defense was inapplicable in this situation because defendant caused the victim to run away from him, thereby creating the victim's refusal to comply with the defendant's request to reenter his car.

On the second issue, the Court finds as a matter of law that the use of force defense is not applicable in a situation where the defendant's own conduct provoked or caused the misconduct on the part of the victim which gave rise to the use of force.

In this case, [the CW] testified that he was continuously tickled and punched while he was in the car with defendant and that caused him to exit the car at the first opportunity when defendant stopped at a convenience store to buy a drink. In essence, the victim ran away from the defendant because of defendant's harassment of the victim.

Having caused the conduct which resulted in the victim's refusal to reenter defendant's car, defendant cannot justify the physical abuse he employed to force [the CW] back into the car. So the Court concludes as a matter of law that the defense is inapplicable.

However, even if the Court did not [sic] find that the use of force defense was applicable in this case, the Court would yet find that the prosecution had disproved the defense beyond a reasonable doubt. In other words, even if the defense were found to be applicable, the Court feels that the prosecution has disproved the defense beyond a reasonable doubt.

In reviewing the evidence, the Court finds that the use of force employed by defendant was not reasonably related to the purpose of safeguarding or promoting the welfare of the minor. Nor was the force used not designed to cause or create a risk of causing substantial bodily injury,

disfigurement, extreme pain or mental distress or neurological damage.

As established by the testimony of an eyewitness, as well as the testimony of the victim, the defendant was hitting the victim with closed fists to his head and body. The blows gave rise to a lump on [the CW's] head as well as other minor scrapes which did not result in any serious [sic] injury or what could be considered extreme pain.

However, striking the victim about the head did create the risk of causing substantial bodily injury or neurological damage. The fact that it did not is fortunate for [the CW], but certainly the risk was present, enough so that defendant's conduct caused bystanders to intervene to protect [the CW] and resulted in defendant becoming involved in an altercation with one of the bystanders.

In addition, the Court finds that hitting the child about the head is not reasonably related to the purpose of safeguarding or promoting the welfare of the child.

This punishment is a far cry from open-handed swat on the child's bottom which many parents employ. Such punishment is appropriate when the behavior sought to be deterred would subject the child to a much more serious risk of harm. By that I mean a swat on the bottom is appropriate when the conduct of the victim is such that if the conduct is not deterred or punished, that the conduct might subject the victim to more serious harm.

But here, the punishment inflicted upon [the CW] created an equal or greater danger of harm to [the CW] which defendant supposedly sought to prevent, as one of the blows to the defendant's (sic) head could have resulted in brain damage, permanent injury or death.

So the Court finds that the prosecution has effectively negated the use of force defense beyond a reasonable doubt. And accordingly, the Court finds the defendant guilty of defense [sic] of abuse of a family or household member.

As the basis for the Court's decision, the Court also would like to add this to its observation. The Court also notes that at no time did defendant attempt to ascertain the reason for the victim's unexplained departure from the vehicle, which would have been a natural reaction for someone who was involved with the safety of the victim.

Mr. Miller could have inquired as to why he left. And had he done so, I would assume that the victim would have explained the reason for his exiting the vehicle. And defendant could have promised the victim that he would not tickle or tease or punch him, to persuade him to reenter the vehicle.

And if that had failed, defendant could have then requested that the victim remain with him so that he could call his father to have his father pick up the victim, which is what the victim had intended to do.

And had all of that been done, then this entire incident could have been avoided. And thereafter, when the victim returned home to his grandparents' home, at that point in time a discussion could have ensued to determine what appropriate punishment the victim would be subject to, if any.

So I think that this entire matter was handled very poorly by the defendant, and it exhibited more a matter of anger on the part of the defendant rather than concern for the victim.

And I think that his conduct, as I said, was consistent with this anger that he exhibited towards the victim. So I don't find that the conduct that he exhibited was one that was designed for the purpose of maintaining the safety and welfare of the child.

## II. The Question Presented.

Miller contends there was insufficient evidence to support his conviction because the State failed to adduce substantial evidence to negate the "parental discipline" justification defense codified at HRS § 703–309(1) (1993). While we may not agree with all of the purported principles of law promulgated by the family court in announcing its verdict, we need not ponder them all, for we conclude there was substantial evidence in any event to negate Miller's HRS § 703–309(1) justifi-

cation defense. *See Fed. Elec. Corp. v. Fasi,* 56 Haw. 57, 64, 527 P.2d 1284, 1290–91 (1974) ("we have repeatedly held that where the trial court has reached a correct conclusion, its decision will not be disturbed on the ground that the reasons it gave for its action were erroneous" (citation omitted)).

### III. Standards of Review.

■ The Hawai'i Supreme Court has stated the standard of review for a claim of insufficiency of the evidence. "On appeal, the test to determine the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact." *State v. Ildefonso,* 72 Haw. 573, 576, 827 P.2d 648, 651 (1992) (citations omitted). "Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to reach a conclusion." *Id.* at 577, 827 P.2d at 651 (citation, internal quotations marks and ellipsis omitted).

■ "An appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge." *State v. Eastman,* 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996) (citations omitted).

It is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of fact; the judge may accept or reject any witness's testimony in whole or in part. As the trier of fact, the judge may draw all reasonable and legitimate inferences and deductions from the evidence, and the findings of the trial court will not be disturbed unless clearly erroneous.

*Id.* (citations omitted). "It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction." *Ildefonso,* 72 Haw. at 576–77, 827 P.2d at 651 (citation and internal quotation marks omitted).

■ However, in a case in which the trial judge found the defendant guilty of abuse of a family or household member and the defendant argued on appeal that the trial judge erred in rejecting his HRS § 703–309(1) defense, the supreme court stated that,

These are conclusions of law (COL), presenting mixed questions of fact and law. "[A] COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each case." *State v. Furutani,* 76 Hawai'i 172, 180, 873 P.2d 51, 59 (1994) (citation and internal quotation marks omitted). Under the clearly erroneous standard, a trial court's decision will not be reversed unless, based upon the entire evidence in the record, the appellate court is left with the definite and firm conviction that a mistake has been made. *Id.* at 179, 873 P.2d at 58.

*State v. Crouser,* 81 Hawai'i 5, 10, 911 P.2d 725, 730 (1996) (brackets in the original). In the course of deciding that the trial judge did not err in rejecting the defense, the supreme court concluded,

There is nothing in the record that leads us to a "definite and firm conviction that a mistake has been made." Therefore, we hold that the trial court's conclusion that the force used was not reasonably related to protecting Minor's welfare was not clearly erroneous.

*Id.* at 12, 911 P.2d at 732. Elsewhere, the supreme court formulated the clearly erroneous standard somewhat differently:

A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.

*State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation and internal quotation marks omitted).

■ In a case conceptually identical to *Crouser,* we recognized that the prosecution must disprove the HRS § 703–309(1) defense beyond a reasonable doubt as a material

element of its case. *State v. Tanielu*, 82 Hawai'i 373, 377–78, 922 P.2d 986, 990–91 (App.1996). *See also* HRS § 702–205 (1993) ("The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as: (a) Are specified by the definition of the offense, and (b) Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction)." (Format modified.)). Accordingly, we stated at the outset of our discussion the standard of review for a claim of insufficiency of the evidence, *Tanielu*, 82 Hawai'i at 378, 922 P.2d at 991, yet placed no express reliance upon it thereafter. Instead, we simply reiterated and applied the *Crouser* clearly erroneous standard to the central question on appeal, whether the trial court erred in rejecting the defendant's HRS § 703–309(1) defense. *Tanielu*, 82 Hawai'i at 380–81, 922 P.2d at 993–94.

## IV. The Relevant Law.

HRS § 703–309(1) provides:

The use of force upon or toward the person of another is justifiable under the following circumstances:

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:

(a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and

(b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

In practice, the defense works like this:

Crouser was charged with abuse of a family or household member, in violation of HRS § 709–906. His conviction required proof beyond a reasonable doubt of each of the following three elements: (1) that he physically abused Minor; (2) that he did so intentionally, knowingly or recklessly; and (3) that Minor was a present or former family or household member of Crouser's. To invoke the defense of justification under HRS § 703–309, Crouser was required to make a showing that the record contained evidence supporting the following elements: (1) he was a parent, guardian, or other person as described in HRS § 703–309(1); (2) he used force against a minor for whose care and supervision he was responsible; (3) his use of force was with due regard to the age and size of the recipient and reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of misconduct; and (4) the force used was not designed to cause, or known to create a risk of causing, substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage. *See State v. Kaimimoku*, 9 Haw.App. 345, 349–50, 841 P.2d 1076, 1079 (1992). In turn, the prosecution had the burden of disproving beyond a reasonable doubt the justification evidence that was adduced, or proving beyond a reasonable doubt facts negativing the justification defense. *Id.* at 350, 841 P.2d at 1079. Because the requirements of HRS § 703–309(1) are set out in the conjunctive, rather than the disjunctive, the prosecution needed only to disprove one element beyond a reasonable doubt to defeat the justification defense.

*Crouser*, 81 Hawai'i at 10–11, 911 P.2d at 730–31 (footnotes omitted).

Observe that the "reasonably related" proviso of HRS § 703–309(1)(a) "provides for objective review of the parent's judgment," *Crouser*, 81 Hawai'i at 12, 911 P.2d at 732, and that, as a gloss,

to be "reasonably related" to the purpose of punishing misconduct, use of force must be both reasonably proportional to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient. Subsection (b) of HRS § 703–309(1) defines the maximum degree of force that is justifiable under the stat-

ute. Subsection (a), as amended, makes clear that physical discipline may be so excessive that it is no longer reasonably related to safeguarding the welfare of the minor, even if it does not exceed the bounds set in subsection (b).

*Crouser*, 81 Hawai'i at 12, 911 P.2d at 732. *See also State v. Stocker*, 90 Hawai'i 85, 94–95, 976 P.2d 399, 408–409 (1999) (refusing to overrule the *Crouser* gloss).

Note also the definition of "substantial bodily injury" contained in HRS § 707–700 (Supp.2003):

"Substantial bodily injury" means bodily injury which causes:

(1) A major avulsion, laceration, or penetration of the skin;

(2) A burn of at least second degree severity;

(3) A bone fracture;

(4) A serious concussion; or

(5) A tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.

*See Crouser*, 81 Hawai'i at 13, 911 P.2d at 733 (the term "substantial bodily injury," as used in HRS § 703–309(1)(b), is " 'defined in section 707–700 of the Hawaii Penal Code.' Sen. Stand. Comm. Rep. No. 2208, in 1992 Senate Journal, at 1023"); *Tanielu*, 82 Hawai'i at 378, 922 P.2d at 991 (the same, citing *Crouser* ).

Observe, as well, that the term "extreme pain" contained in HRS § 703–309(1)(b) can be interpreted *"noscitur a sociis* with substantial bodily injury[.]" *Crouser*, 81 Hawai'i at 13, 911 P.2d at 733 (citing *State v. Deleon*, 72 Haw. 241, 244, 813 P.2d 1382, 1383–84 (1991) (in order to define the term "extreme pain," contained in an earlier incarnation of the defense that referred to "death, serious bodily injury, disfigurement, extreme pain or mental distress, or gross degradation[,]" HRS § 703–309(1)(b) (1985), we must "look to the other results arising from the use of force by a parent against a child which are forbidden by the statute")).

## V. Discussion.

■ After applying the foregoing law and standards of review to the evidence at trial viewed "in the light most favorable to the State," *Ildefonso*, 72 Haw. at 576, 827 P.2d at 651, and giving full play to the family court's prerogatives in determining the credibility of witnesses and the weight of evidence, *Eastman*, 81 Hawai'i at 139, 913 P.2d at 65, we are convinced there clearly was "substantial evidence" adduced, *Ildefonso*, 72 Haw. at 576–77, 827 P.2d at 651; *Okumura*, 78 Hawai'i at 392, 894 P.2d at 89, to support a conclusion that what Miller levied upon the CW was a wanton beating, that (1) was not "reasonably related to the purpose of safeguarding or promoting the welfare of the [CW], including the prevention or punishment of the [CW's] misconduct[,]" HRS § 703–309(1)(a), nor "reasonably proportional to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient[,]" *Crouser*, 81 Hawai'i at 12, 911 P.2d at 732; and (2) directly or by its common sequelae is "known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage." HRS § 703–309(1)(b); HRS § 707–700; *Crouser*, 81 Hawai'i at 13, 911 P.2d at 733. Hence, there was sufficient evidence to negate Miller's HRS § 703–309(1) defense, *Ildefonso*, 72 Haw. at 576–77, 827 P.2d at 651, and the family court's rejection of that defense was not clearly erroneous, *Okumura*, 78 Hawai'i at 392, 894 P.2d at 89, as the case may be. In the final analysis, we are not "left with a definite and firm conviction that a mistake was made in this case." *Crouser*, 81 Hawai'i at 10, 911 P.2d at 730 (brackets, citation and internal quotation marks omitted).

As we concluded elsewhere, "the viciousness of the attack [Miller] was involved in severed any relationship between the use of force and the welfare of [the CW] which might be considered reasonable." *Tanielu*, 82 Hawai'i at 381, 922 P.2d at 994 (internal quotation marks omitted).

## VI. Conclusion.

Accordingly, the February 6, 2003 judgment of the family court is affirmed.