NO. 29445

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
CEDRIC K. KIKUTA, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(FC-CRIMINAL NO. 07-1-0056)


MEMORANDUM OPINION
(By: Foley and Fujise, JJ.; and
Nakamura, C.J., dissenting)

Defendant-Appellant Cedric K. Kikuta (Kikuta) appeals
from the Judgment of Conviction and Sentence filed on October 1,
2008 in the Family Court of the First Circuit (family court).[1] A
jury convicted Kikuta of Assault in the Third Degree, in
violation of Hawaii Revised Statutes (HRS) § 707-712 (1993),[2][3]
against his then-stepson (Complainant), who was a minor at the
time.[4] The family court sentenced Kikuta to one year of
probation and two months of imprisonment and ordered him to pay
various fees.

On appeal, Kikuta argues that the family court (1)
erred by failing to instruct the jury on Kikuta's parental

---

[1] The Honorable Rhonda A. Nishimura presided.

[2] HRS § 707-712 provides:

§707-712 **Assault in the third degree.** (1) A person commits
the offense of assault in the third degree if the person:

    (a)    Intentionally, knowingly, or recklessly causes bodily
        injury to another person; or

    (b)    Negligently causes bodily injury to another person
        with a dangerous instrument.

    (2)    Assault in the third degree is a misdemeanor unless
committed in a fight or scuffle entered into by mutual consent, in
which case it is a petty misdemeanor.

[3] Kikuta was charged with Assault in the Second Degree, in violation of
HRS § 707-711(1)(a) (Supp. 2007), but the jury found him guilty of the lesser
offense of Assault in the Third Degree.

[4] Complainant was fourteen at the time of the incident.

discipline defense[5] where there was support in the evidence for that instruction and (2) plainly erred by failing to instruct the jury that it was required to determine whether Assault in the Third Degree had been committed during a fight or scuffle entered into by mutual consent. Kikuta requests that we vacate his conviction and remand his case for a new trial on the charge of Assault in the Third Degree.

## I. BACKGROUND

### A. Complainant's testimony

At trial, Complainant testified that he had known Kikuta for about five or six years. At the time of the incident, Kikuta was his step-father and lived with Complainant and his mother. Complainant stated that Kikuta had been more or less the father figure in his life, Complainant called Kikuta "dad," and Kikuta called Complainant "son." They did some father and son things together, like play basketball and fish, and Kikuta helped him with his school work, but the two had arguments and their ups and downs and "never actually got along that well."

On the morning of September 30, 2007, Complainant and his cousin (Cousin) were in the game room at Complainant's house, when Kikuta went into the game room and told Complainant to feed the dog. Complainant's mom was at McDonald's. Kikuta had recently had surgery on his leg, was in a cast, and walked with

---

[5] HRS § 703-309(1) (1993) provides:

§703-309 **Use of force by persons with special responsibility for care, discipline, or safety of others.** The use of force upon or toward the person of another is justifiable under the following circumstances:

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:

(a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and

(b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

crutches. Complainant told Kikuta he would feed the dog in five minutes because he was busy watching a video on his computer. Five minutes later, Complainant and Cousin went to the kitchen, and Complainant fed the dog dry grains mixed with baby food. Complainant cleaned the dog bowl, then returned to the game room. He testified he was not sure if he left the baby food jar on the kitchen counter.

Later, Kikuta saw a stain on the carpet of the game room that was from the dog's diarrhea and told Complainant to clean it up. The stain had been there for about six months. When it first appeared, Complainant had wiped it with a napkin, which did not work. Complainant told Kikuta he could not clean it because it was a stain. Kikuta and Complainant were kind of yelling at each other. Complainant testified on direct examination that Kikuta told him, "I bet I could get it out," and he responded, "I bet you not." However, on cross-examination, Complainant testified that he told a detective he initiated the bet. Kikuta bet Complainant that if Kikuta could remove the stain, Complainant would be grounded for a year. Complainant responded with what happened to come to his mind, which was if Kikuta could not remove the stain, Complainant could kick Kikuta in his injured leg.

Kikuta left the game room through a glass door to get something from the kitchen to clean the carpet, and Complainant slammed the glass door shut because he was pretty sure Kikuta could get out the stain and he was mad because he did not want to be grounded. Complainant had been yelled at before about slamming the glass door because it could shatter and break.

Kikuta came back into the game room, looking angry. Through the glass door, Kikuta tried to get Complainant's attention, but Complainant ignored him. Complainant testified he thought Kikuta may have yelled at him for slamming the door. Complainant did not say anything and was mad. Kikuta then slammed open the glass door, dropped the crutches, and pushed Complainant backwards into another glass door. Complainant said, "Ow, stop," and got up.

Kikuta pushed Complainant back down, and Complainant grabbed one of Kikuta's crutches and stood up, holding the crutch sideways. Complainant grabbed the crutch because he thought Kikuta could not walk or run without it and that would enable Complainant to get away. Complainant testified that he did not try to hit Kikuta or make any movement toward Kikuta with it, but he figured Kikuta thought he was going to whack him with it. Complainant and Kikuta were not saying anything to each other during this time. Complainant tried to get past Kikuta to the room's only exit. Kikuta pushed the crutch against Complainant, causing Complainant to hit the glass door again.

Complainant testified that Kikuta then punched him five times on the right side of his face with a closed fist. However, on cross-examination, Complainant admitted that in a statement to a detective and under oath at a hearing, he said Kikuta punched him four or five times. Complainant conceded that it could have been four or five times. It hurt when Kikuta punched him. Complainant fell to his knees and covered his head while he looked at the floor. Kikuta punched him two or three times on the back of the head. Kikuta was standing on one foot. Complainant said, "Ow, stop." Kikuta left the room, and Complainant remained there, spitting out little pieces of his teeth.

Complainant was fifteen at the time of trial. At the time of the incident, he was a couple of inches shorter than six feet tall and weighed about 160 pounds. He testified he had not given Kikuta permission to hit him, had not threatened to hit Kikuta, and had not hit Kikuta. Complainant stated that although he had not intentionally acted like he was going to hit Kikuta, it may have looked like he was going to do so.

Complainant and Cousin went to Complainant's bedroom, and Complainant saw in the mirror that his nose was bleeding and the right side of his face was swollen. They cleaned Complainant's nose. Kikuta came to the doorway and told Complainant to clean up the game room. Complainant responded, "No, you just hit me. Why should I clean up my room?" Kikuta said something (which Complainant could not remember at trial)

4

and then raised his hands to his face in a boxer's stance, as if he wanted to fight again. The crutches were off to the side, and Kikuta was standing on one leg. Complainant said "Never mind. I'll just clean my room" and walked back to the game room with Cousin. Cousin and Complainant cleaned the game room.

Kikuta then went into the game room and told Complainant to give the dog some water. Complainant did as he was told. Complainant testified that he did not recall what happened next, but he might have been mumbling something under his breath when Kikuta began chasing him around the kitchen on his crutches, saying "I can catch you even with a broken leg." Complainant stated that Kikuta may have thought Complainant said something bad when he was mumbling. Complainant ran away because he did not want to get hit again. The chase stopped, and Complainant returned to the game room.

Complainant's mom came home, and Complainant and Cousin told her what happened. She yelled at Complainant and Cousin to get in the car, and they went to K-Mart and then to church. After church, they went to Pali Momi Hospital (Pali Momi).

As a result of the incident, the right side of Complainant's face was swollen, his nose was broken, three of his teeth were chipped, his wrist was red and swollen, his right forearm area was bruised, he had a bruise below his right eye, and he had a bump on the back of his head. He had to wear a splint on his wrist.

About two and a half years prior to the incident, when Complainant was twelve years old, another incident had occurred between him and Kikuta. Kikuta asked Complainant to cook some rice. Complainant cooked the rice, and Kikuta became upset because it was mushy. Kikuta yelled at Complainant and told him to make it again, but Complainant did not do so. Using the mushy rice, Complainant made himself dinner. Complainant's friend (Friend) was at the house with him. Complainant did not remember at trial if Kikuta told or asked him to give Friend some of the food, but when Complainant offered Friend some, Friend did not want any. Complainant and Friend went into the game room. While Complainant was eating his food, with Friend in the room, Kikuta

came in and knocked the bowl of food out of Complainant's hand. Complainant testified that Kikuta may have said something prior to knocking the bowl, but Complainant could not recall what it was.  Complainant was kind of scared.  Rice and meat from the bowl landed all over the walls, floor, and ceiling and on Complainant's hair and clothes.  Complainant tried to clean up the food, and Kikuta knocked the bowl out of his hands again. Complainant did not say anything to Kikuta.  Kikuta went to the living room and sat down on the couch.

Complainant went into the kitchen and grabbed a sushi knife because he did not want Kikuta to come back into the game room.  From about fifteen or twenty feet away, Complainant showed Kikuta the knife and said, "Come on," "Stay away from me," and some other things he did not remember at trial.  Kikuta told Complainant to put the knife away.  Kikuta told Complainant a second time to put the knife away before Kikuta counted to three. Kikuta counted to three and stood up, and Complainant ran into the kitchen and threw the knife into the sink.  Complainant was afraid of getting hit.  Afterwards, Kikuta acted like nothing happened.

**B.    Cousin's testimony**

Cousin's testimony was substantially similar to Complainant's.  Cousin also testified as follows:

Complainant's mom was Cousin's aunt.  At the time of the incident, Cousin was thirteen years old.

On the day of the incident, Kikuta taught Complainant how to feed the dog by mixing dog food with baby food and how to wash the dog's water bowl.  After Complainant fed the dog and washed the water bowl, Cousin and Complainant returned to the game room.

When Kikuta complained to Complainant about the stain, Complainant told Kikuta that it had been there for like a year. Cousin testified that Kikuta was the one to bring up the bet. However, Cousin later testified that Complainant actually started the whole idea of a bet by asking Kikuta if he wanted to bet Kikuta could not remove the stain.  Then, Kikuta responded by setting a term.

Cousin testified that it was a rule in Complainant's house that the glass door was not to be slammed because it was glass and also because there was a wire going through it.

When Kikuta entered the game room, Complainant walked back toward another door in the room and Kikuta threw down the crutches and tackled Complainant. By "tackled," Cousin meant that Kikuta pushed and then fell on Complainant. Complainant went face first into the glass door and fell. As Complainant tried to get up, Kikuta hit Complainant with his fist "full on" about four or five more times on Complainant's left cheek and on Complainant's "nose a little bit." Complainant fell down again. Kikuta hit Complainant three times to the back of the head. Complainant tried to get up again, but Kikuta hit him maybe four times to his left check and Complainant fell down again.

At this point, Complainant picked up the crutch and held it in a defensive manner. Kikuta told Complainant he should use the crutch against Kikuta and fight. Complainant did not do anything or make any movements toward Kikuta with the crutch. Cousin testified that Complainant was "kind of like backing off," holding the crutch, when Kikuta tackled Complainant again and they fell "to the side of the wall." Complainant huddled up, and Kikuta hit Complainant a couple more times. Cousin testified that Kikuta may have hit Complainant in the head about fifteen times.

On cross-examination, Cousin admitted he told a detective after the incident that Kikuta hit Complainant in the face four or five times and on the back of the head three times, but not that Kikuta hit Complainant fifteen or more times. Kikuta's counsel read out loud Cousin's statement, made under oath, that Kikuta held up Complainant while he was punching him; however, Cousin testified that he did not remember making the statement.

Cousin and Complainant first went to the bathroom to clean up Complainant, whose nose was bleeding. Cousin saw the pieces of tooth that had chipped off. They then went into Complainant's bedroom. Kikuta appeared at the bedroom door and told Complainant to clean the game room. Complainant said to

Kikuta, "Do you really expect me to listen to you after you just hit me?," and Kikuta told Complainant to fight him. Kikuta struck a fighter's pose, with his arms up, and said something like, "Fight me again, Boy." Complainant said "No" and stayed back.

After Cousin and Complainant cleaned the game room, they went to the kitchen to clean dog pads. Kikuta and Complainant began arguing. Kikuta told Complainant, "I can catch you even with this broken leg, Boy."

Cousin testified that Complainant had never done anything to Kikuta, acted threateningly or aggressively toward Kikuta, hit or acted like he was going to hit Kikuta, or acted like he was going to hit Kikuta with the crutch, moved toward Kikuta with the crutch, or threatened Kikuta while holding the crutch. In Cousin's opinion, Kikuta "started this" because he began making terms for the bet and was the first one to make physical contact.

C.    Stephen Graner, M.D.'s testimony

Stephen Graner, M.D. (Dr. Graner) testified that he examined Complainant at Pali Momi after the incident. Complainant had a broken nose (bone fracture), bruised cheek, chipped teeth, bruised forearm, and an injured wrist. Dr. Graner recommended a splint for Complainant's wrist, acetaminophen or Tylenol for pain, an ice pack for sore areas, and follow-up with his doctor and dentist in the following few days. In Dr. Graner's opinion, Complainant had sustained substantial bodily injury because Complainant had a bone fracture. Dr. Graner testified that the bone that was broken in Complainant's nose was easy to break because it was fairly thin.

D.    Kikuta's testimony

Kikuta's testimony was similar to Complainant's in some respects; however, Kikuta also testified to the following.

Kikuta had been Complainant's father figure in the six years he had known Complainant. When Kikuta met Complainant, Complainant was an average student, but then Kikuta helped Complainant with his school work and that changed. Over the course of their relationship, Kikuta and Complainant would do

father-and-son things together, such as go fishing and camping, drive box cars and go-carts, and play football, basketball, and baseball. Kikuta and Complainant did get into arguments when Complainant was a teenager, and Kikuta had to reprimand him by taking away his TV, computer, and video game privileges. Kikuta had gotten used to Complainant giving him "attitude," and by the time of the incident, it had gotten to the point where it just irritated him. Kikuta loved Complainant and cared and provided for him.

On the day of the incident, Kikuta asked Complainant to feed the dog and clean the dog pad, which was where the dog relieved itself. Kikuta testified that after Complainant did as he was asked, Kikuta asked Complainant to put away the dog food that Complainant had left out and fill up the dog's water bowl. Complainant did as he was told.

At some point later, Kikuta asked Complainant to clean up the dog stain. Kikuta thought the stain had been there for maybe a day, but he was not sure. Complainant told Kikuta that Complainant could not get the stain up. Kikuta told Complainant that Kikuta could do it, and Complainant said, "You wanna bet?" Ater they made the bet, Complainant was pretty mad and ran into the play room and slammed the glass door.

Kikuta was getting cleaning supplies when he heard Complainant slam the glass door. Kikuta went to the game room. He was upset and his tolerance was getting very low because he had told Complainant many times not to slam the door. It was as if Complainant had done it to get back at him. Kikuta called Complainant's name, but Complainant was looking at a video and did not answer him. Kikuta called his name again, and Complainant did not respond; Complainant just ignored him.

Kikuta then entered the game room, stooped down, and pushed Complainant, who was sitting down, on the shoulders, with two hands. Kikuta was off-balance, and the crutches fell out from under his arms. Kikuta pushed harder against Complainant than he had intended to because he lost his balance, and Complainant's head hit a door jamb behind him. Complainant picked up one of the crutches with both hands, stood up, and

swung it at Kikuta. Kikuta blocked the crutch, then hit Complainant twice on the face. Kikuta had not aimed for Complainant's face. Kikuta testified that "maybe -- you know, like, he was holding onto it [the crutch] and I punched him twice to try to make him let go of that crutch." Kikuta testified that he punched in reaction to what had just happened and had not had time to think about it. Kikuta calmly asked Complainant what made him think he could do that, picked up his crutch, and left. He was not mad. Kikuta did not see swelling or chipped teeth and did not see Complainant's nose bleeding, although Complainant said he was hurt. Kikuta testified that he did not know he had hit Complainant that hard.

At the time of the incident, Kikuta was 5'7" tall and weighed between 207 and 212 pounds. At the time of trial, he was forty-three years old.

At no point later that day did Kikuta touch Complainant or get into a kind of boxing stance. Kikuta did not chase Complainant around the kitchen or tell Complainant that he could still hurt or catch Complainant even though his leg was hurt.

Kikuta testified that during the incident, he was afraid that Complainant would hurt him. Around two or three months prior to the incident, Complainant had his Friend over to the house. Complainant, Friend, and Kikuta were in the kitchen, and Complainant was going to eat dinner. Kikuta told Complainant to offer Friend some food. Complainant said, "Why? I made it." Kikuta told Complainant that maybe he should wait until Friend left to eat. Complainant again said, "Why? I made it," and walked into the playroom. Kikuta went in after Complainant and repeated that maybe Complainant should not eat dinner. Complainant told Kikuta to leave him alone because his mom was going to get mad. Kikuta tipped the bowl out of Complainant's hand, and said "Stop eating" and "[M]aybe you shouldn't have dinner tonight." Rice flew onto Complainant. Kikuta told Complainant to clean up the food and put the bowl away.

Complainant yelled something, and Kikuta went into the living room to watch TV on the couch with Complainant's grandmother. While Kikuta was watching TV, Complainant took a

nine-inch-long sashimi knife that had a big blade and went into the dining room area where only he and Kikuta could see each other. Complainant looked pretty mad and said, "Come on." Kikuta told him to put the knife away right then. Complainant again said, "Come on." After a pause, Kikuta told him to put the knife away by the time Kikuta counted to three. Kikuta counted to three, and Complainant put the knife away.

### E.    Jury instructions

Prior to trial, Kikuta filed Defendant's Proposed Jury Instruction No. 2 regarding the parental discipline defense.

At trial, the family court and the parties' counsel settled the jury instructions. With regard to the proposed instruction on the parental discipline defense, the deputy prosecuting attorney (Prosecutor) argued it should not be given, and Kikuta's public defender (Public Defender) disagreed. The Prosecutor argued that Kikuta was precluded from asserting the parental discipline defense because he had caused substantial bodily injury to Complainant.[6] The Public Defender conceded that Kikuta had caused Complainant substantial bodily injury. However, the Public Defender argued, whether the force Kikuta used was **designed to cause or known to create a risk of causing** substantial bodily injury, disfigurement, etc. under HRS § 703-309 was a question for the jury to decide.

The family court, citing to State v. Matavale, 115 Hawai'i 149, 166 P.3d 322 (2007),[7] stated that HRS § 707-712

---

[6] In State v. Crouser, 81 Hawai'i 5, 11, 911 P.2d 725, 731 (1996), the Hawai'i Supreme Court held that because the requirements of HRS § 703-309(1) are set out in the conjunctive, the State need only disprove one element beyond a reasonable doubt to defeat the justification defense.

[7] In Matavale, the Hawai'i Supreme Court stated the following with regard to the legislative history behind HRS § 703-309:

> In 1992, the legislature, in considering an amendment to HRS § 703-309(1) (1985), expressly recognized -- through the adoption of a standing committee report by the Senate Judiciary Committee -- that
>
> > the line between physical abuse and appropriate parental discipline is a very subjective one. What one parent considers discipline may seem abusive to another. *Your Committee had to consider how best to draw the line in the context of the legal defense provided for parents* and

(continued...)

[7](...continued)
    guardians when determining guilt in a criminal trial. *Your Committee believes that the "gray areas" must be resolved by not criminalizing such parental discipline, even if a majority of the community would find the extent of the punishment inappropriate.*

Sen. Stand. Comm. Rep. No. 2493, in 1992 Senate Journal, at 1121 (emphases added). In its attempt to best "draw the line," the legislature amended HRS § 703-309(1) (1985) to include the following underscored new language in subsections (1)(a) and (1)(b) and to remove the terms "death" and "gross degradation" from subsection (1)(b):

> The use of force upon or toward the person of another is justifiable under the following circumstances:
>
> (1)    The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:
>
> (a)    The force is *employed with due regard for the age and size of the minor and is reasonably related to the* purpose of safeguarding or promoting the welfare of the minor, including the prevention or *punishment of the minor's misconduct;* and
>
> (b)    The force used is not designed to cause or known to create a risk of causing *substantial* bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

(Emphases added.) *See* 1992 Haw. Sess. L. Act 210, § 1 at 554.

The legislature indicated that the purpose of the aforementioned amendments was "to limit the *amount of force* that parents and guardians can legally use in disciplining their children to that which is *reasonable or moderate.*" Sen. Stand. Comm. Rep. No. 2208, in 1992 Senate Journal, at 1022 (internal quotation marks omitted) (emphases added); Conf. Comm. Rep. No. 103, in 1992 House Journal, at 843. The amendments also brought the subject statute "much closer to the formulation found in the Restatement (Second) of Torts § 147 . . . and that used by a substantial majority of other jurisdictions." *State v. Crouser,* 81 Hawai'i 5, 12, 911 P.2d 725, 732 (1996) (citation omitted). As the conference committee report regarding the amendments makes clear, the amendment to *subparagraph (a)* of subsection (1) was

> intended to further clarify the *level of force* one may use upon minors[.]  In determining whether or not the *level of force* is permitted under law, a court must consider the age and size of the recipient and whether a reasonable relationship exists between *the force used* and a legitimate purpose as specified in the statute.

Conf. Comm. Rep. No. 103, in 1992 Senate Journal, at 783 (emphases added). Also, according to the Senate Judiciary Committee, the amendment to *subparagraph (b)* of subsection (1) was intended to

(continued...)

12

had been amended in the past to limit the amount of force parents and guardians could legally use in disciplining children. The family court further stated that to allow Kikuta to assert the parental-discipline defense on the basis that the force he used was not designed to cause substantial bodily injury would allow similarly situated defendants to assert the defense even if their force caused neurological damage, burns of the second degree or worse, major lacerations, or serious concussions, and that was not in keeping with the legislative intent. The family court refused to give the instruction.

## II.   STANDARDS OF REVIEW

### A.   Parental Discipline Defense

> Because the question of whether the force employed was reasonably related to the welfare of the minor involves the trial court's evaluation of mixed questions of law and fact, the trial court's conclusion on this issue, insofar as it is dependent upon the facts and circumstances of the case, is reviewed on appeal under the clearly erroneous standard. However, to the extent the conclusion is premised on the court's interpretation of the applicable statute, the conclusion is freely reviewable on appeal.

State v. Tanielu, 82 Hawai'i 373, 380-81, 922 P.2d 986, 993-94 (App. 1996) (citations omitted).

---

[7](...continued)
lower the standard of harm

> by lowering the level of risk, and *reducing the permissible level of injury to that which is less than "substantial"* as defined in section 707-700 of the Hawai'i Penal Code. While the permissible level of injury may still appear high, it is clearly a lower and more appropriate threshold.

> By using terms in the Hawai'i Penal Code, your Committee believes that *the standard is clearer for both the police and the public to understand and follow.*

Sen. Stand. Comm. Rep. No. 2208, in 1992 Senate Journal, at 1022-23 (emphases added). The legislature, nevertheless, opined that "the terms retained from the prior law must be reinterpreted by the courts, since the changes affect the application of the rule of construction applied in [*State v. Deleon*, 72 Haw. 241, 813 P.2d 1382 (1991)]." Sen. Stand. Comm. Rep. No. 2493, in 1992 Senate Journal, at 1121. However, the legislature expressly indicated that "the changes were not intended to create a standard under which the result in *Deleon* would have been different. *The force used by the father in Deleon,* as described in the decision, *did not exceed the permissible force under the new language.*" *Id.* (emphases added).

Matavale, 115 Hawai'i at 160-62, 166 P.3d at 333-35 (footnotes, brackets, and ellipses in original omitted).

## B.    Jury Instructions

In a criminal trial, an "accused is entitled to an instruction on every defense supported by the evidence, no matter how inconclusive the evidence may be, provided that evidence would support consideration of that issue by the jury."  State v. McMillen, 83 Hawai'i 264, 265, 925 P.2d 1088, 1089 (1996).  In addition,

> a defendant has the right to argue inconsistent defenses and he or she would be entitled to have the jury instructed on ostensibly inconsistent theories of defense if there is evidence supporting the theories.  He or she would be entitled also to an instruction on a defense fairly raised by the evidence, though it may be inconsistent with the defense he advanced at trial.

State v. Ortiz, 93 Hawai'i 399, 404-05, 4 P.3d 533, 538-39 (App. 2000) (brackets in original omitted) (quoting State v. Ito, 85 Hawai'i 44, 46, 936 P.2d 1292, 1294 (App. 1997)).

> When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.
>
> Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.
>
> Error is not to be viewed in isolation and considered purely in the abstract.  It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled.  In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.
>
> If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

State v. Gonsalves, 108 Hawai'i 289, 292-93, 119 P.3d 597, 600-01 (2005) (internal quotation marks, citations, and brackets omitted; block quote format changed) (quoting State v. Arceo, 84 Hawai'i 1, 11-12, 928 P.2d 843, 853-54 (1996)).

## C.    Statutory Interpretation

> "The interpretation of a statute is a question of law reviewable *de novo*." *Capua v. Weyerhaeuser Co.*, 117 Hawai'i 439, 44[4], 184 P.3d 191, 196 (2008) (citing *Flor v. Holguin*, 94 Hawai'i 70, 76, 9 P.3d 382, 388 (2000)) (brackets, citations, and ellipses omitted).  Statutory construction is guided by the following rules:

> First, the fundamental starting point for
> statutory interpretation is the language of the
> statute itself. Second, where the statutory
> language is plain and unambiguous, our sole duty
> is to give effect to its plain and obvious
> meaning. Third, implicit in the task of
> statutory construction is our foremost
> obligation to ascertain and give effect to the
> intention of the legislature, which is to be
> obtained primarily from the language contained
> in the statute itself. Fourth, when there is
> doubt, doubleness of meaning, or
> indistinctiveness or uncertainty of an
> expression used in a statute, an ambiguity
> exists. And fifth, in construing an ambiguous
> statute, the meaning of the ambiguous words may
> be sought by examining the context, with which
> the ambiguous words, phrases, and sentences may
> be compared, in order to ascertain their true
> meaning.
>
> *Carlisle v. One (1) Boat*, 119 Hawai'i 245, 256, 195 P.3d
> 1177, 1188 (2008) (quoting *In re Contested Case Hearing on
> Water Use Permit Application*, 116 Hawai'i 481, 489-90, 174
> P.3d 320, 328-29 (2007)) (block quotation format altered).

State v. Woodfall, 120 Hawai'i 387, 391, 206 P.3d 841, 845
(2009).

### D.    Plain Error/Rule 52(b)

Hawai'i Rules of Penal Procedure Rule 52(b) states that
"[p]lain errors or defects affecting substantial rights may be
noticed although they were not brought to the attention of the
court." Therefore, an appellate court "may recognize plain error
when the error committed affects substantial rights of the
defendant." State v. Staley, 91 Hawai'i 275, 282, 982 P.2d 904,
911 (1999) (internal quotation marks and citation omitted).

The appellate court "will apply the plain error
standard of review to correct errors which seriously affect the
fairness, integrity, or public reputation of judicial
proceedings, to serve the ends of justice, and to prevent the
denial of fundamental rights." State v. Nichols, 111 Hawai'i
327, 334, 141 P.3d 974, 981 (2006) (quoting State v. Sawyer, 88
Hawai'i 325, 330, 966 P.2d 637, 642 (1998)). An appellate
court's "power to deal with plain error is one to be exercised
sparingly and with caution because the plain error rule
represents a departure from a presupposition of the adversary
system -- that a party must look to his or her counsel for
protection and bear the cost of counsel's mistakes." Nichols,

111 Hawai'i at 335, 141 P.3d at 982 (quoting State v. Kelekolio, 74 Haw. 479, 515, 849 P.2d 58, 74-75 (1993)).

## III. DISCUSSION

Kikuta contends the family court erred in failing to instruct the jury on the parental discipline defense where there was support in the evidence for such an instruction. He maintains that despite the family court's finding that his force against Complainant created substantial bodily injury, the court should have given the jury the instruction because the nature and not the result of the conduct determines whether the force used as parental discipline is permissible. Kikuta cites to State v. Miller, 105 Hawai'i 394, 98 P.3d 265 (App. 2004), to support this argument.

In the instant case, because the family court concluded that Kikuta was not entitled to a jury instruction on the parental discipline defense based on the court's interpretation of HRS § 703-309, we review the conclusion de novo. Tanielu, 82 Hawai'i at 380-81, 922 P.2d at 993-94.

HRS § 703-309(1)(b) provides in relevant part that "[t]he use of force upon or toward the person of another" by "a parent or guardian or other person similarly responsible for the general care and supervision of a minor" is justifiable if, among other things, "[t]he force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage."[8] (Emphasis added.) In the instant case, it is undisputed that as a result of the incident, Complainant's nose was broken and the broken nose constituted a substantial bodily injury. The question on appeal is whether Kikuta was entitled to assert the parental discipline defense because there was a question as to whether his force was "designed to cause or known

---

[8] The family court did not refuse to instruct the jury on the parental discipline defense on the ground that the force was "employed with due regard for the age and size of the minor and [was] reasonably related to the purpose of safeguarding or promoting the welfare of the minor including the prevention or punishment of the minor's misconduct." HRS § 703-309(1)(a). It is not disputed that Kikuta offered evidence to satisfy this element of the parental discipline defense.

16

to create a risk of causing substantial bodily injury," HRS § 703-309(1)(b) (emphasis added), or whether the fact that the force he used caused substantial bodily injury precluded him from asserting the defense.

There is a question of fact as to whether Kikuta's force against Complainant was designed to cause or known to create a risk of causing substantial bodily injury. At what point during the incident Kikuta broke Complainant's nose is unclear. Evidence adduced at trial showed that Kikuta pushed Complainant backward against a door jamb or glass door, allegedly tackled him twice, punched him in the face anywhere from two to ten times, and allegedly punched him in the back of the head two or three times. According to the plain language of HRS § 703-309, what type and degree of force broke Complainant's nose and whether that force was designed to break his nose or known to create a risk of doing so was a question for the jury, as fact finder, to decide. See State v. Romano, 114 Hawai'i 1, 8, 155 P.3d 1102, 1109 (2007) ("Matters of credibility and the weight of the evidence and the inferences to be drawn are for the fact finder.") Hence, the family court erred by not submitting the instruction on the parental discipline defense to the jury.

Miller supports our holding. There, this court affirmed the Family Court of the Third Circuit's conviction of Miller for abuse of a family member. Miller, 105 Hawai'i at 402, 98 P.3d at 273. In finding that the State had rebutted Miller's parental discipline defense, the Third Circuit Family Court distinguished between the nature and result of the actor's use of force pursuant to HRS § 703-309, stating that even though the complainant did not suffer any of the prohibited injuries set forth in HRS § 703-309, Miller's "striking the victim about the head did create the risk of causing substantial bodily injury or neurological damage." Miller, 105 Hawai'i at 399, 98 P.3d at 270. In the instant case, it follows that conversely, even though Kikuta caused Complainant to suffer substantial bodily injury, a jury may have found that Kikuta did not use force that was "designed to cause or known to create a risk of causing" substantial bodily injury. HRS § 703-309(1)(b).

17

The legislative history described in <u>Matavale</u> does not change this result.

Because we vacate and remand for a new trial, we choose not to address Kikuta's second point that the family court plainly erred in failing to instruct the jury it was required to determine whether the Assault in the Third Degree had been committed during a fight or scuffle entered into by mutual consent.[9]

## IV.   CONCLUSION

The Judgment of Conviction and Sentence filed on October 1, 2008 in the Family Court of the First Circuit is vacated, and this case is remanded for a new trial consistent with this opinion.

DATED:   Honolulu, Hawai'i, May 18, 2010.

On the briefs:

Jon N. Ikenaga,
Deputy Public Defender,
for Defendant-Appellant.

Anne K. Clarkin,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Associate Judge

Associate Judge

---

[9]   Kikuta did not request such an instruction.

18